NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

COALITION OF AMERICAN MILLWORK
PRODUCERS,

                    Plaintiff,

      v.

UNITED STATES,

                    Defendant,

        and

ARAUPEL S.A.,

                    Defendant-Intervenor.

Before:  Hon. Jennifer Choe-Graves,
          Judge

Court No. 21-00047

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed from Pages: 4-6, 9, 12-18

## <u>COALITION OF AMERICAN MILLWORK PRODUCERS REPLY BRIEF</u>

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition of American
Millwork Producers*

Dated: December 6, 2021

Ct. No. 21-00047                                           NON-CONFIDENTIAL VERSION

## <u>TABLE OF CONTENTS</u>

Page

I.     INTRODUCTION .................................................................................................. 1

II.    ARGUMENT ......................................................................................................... 1

    A.    Commerce's Determination to Collapse Araupel with Braslumber/BrasPine Was Unsupported by Substantial Evidence and Inconsistent with Law ................................................................................ 2

        1.    Affiliation ........................................................................................ 2

        2.    Substantial Retooling ...................................................................... 3

        3.    Significant Potential for the Manipulation of Price or Production ....................................................................................... 3

        4.    Consistency with the Purpose of the Collapsing Provision ...................... 10

    B.    Commerce Improperly Adjusted Araupel's Reported Costs by the Fair Value Adjustment Pertaining to Unharvested Forests ..................................... 12

    C.    Commerce's Failure to Apply the Major Input Rule and Adjust Araupel's Log Purchases Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law ......................................................... 14

    D.    Commerce's Selection of the Rate to Impute Araupel's Credit and Inventory Carrying Cost Expenses Was Improper .................................................... 18

III.    CONCLUSION .................................................................................................. 22

Ct. No. 21-00047                                          NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*China Steel Corp. v. United States,*
  27 CIT 715, 264 F. Supp. 2d 1339 (2003) ..............................................................22

*CS Wind Vietnam Co. v. United States,*
  832 F.3d 1367 (Fed. Cir. 2016) ...............................................................................8

*Jinko Solar Co. v. United States,*
  229 F.Supp.3d 1333 (Ct. Int'l Trade 2017) ........................................................6, 10

*LMI—LA Metalli Industriale, S.p.A. v. United States,*
  912 F.2d 455 (Fed. Cir. 1990) ................................................................................18

*Luoyang Bearing Corp. v. United States,*
  28 CIT 733, 347 F. Supp. 2d 1326 (2004) ..............................................................22

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ....................................................................................................8

*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006) ................................................................................8

*NMB Sing. Ltd. v. United States,*
  557 F.3d 1316 (Fed. Cir. 2009) ..............................................................................20

*Prosperity Tieh Enter. Co. v. United States,*
  965 F.3d 1320 (Fed. Cir. 2020) ..............................................................................10

*Rhone Poulenc, Inc. v. United States,*
  899 F.2d 1185 (Fed. Cir. 1990) ..............................................................................12

*U.S. Steel Corp. v. United States,*
  179 F. Supp. 3d 1114 (Ct. Int'l Trade 2016) .......................................................4, 17

*Weishan Hongda Aquatic Food Co. v. United States,*
  917 F.3d 1353 (Fed. Cir. 2019) ..............................................................................22

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................................8

19 U.S.C. § 1677b(f)(1)(A) ..........................................................................................12

Ct. No. 21-00047                                        NON-CONFIDENTIAL VERSION

**Regulations**

19 C.F.R. § 351.401(f)(2) ..............................................................................3, 4

19 C.F.R. § 351.401(f)(2)(ii) ................................................................................5

**Administrative Materials**

*4th Tier Cigarettes From the Republic of Korea*, 85 Fed. Reg. 79,994 (Dep't
    Commerce Dec. 11, 2020) ...........................................................................21

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (Dep't
    Commerce May 19, 1997) ...........................................................................10

*Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From
    Korea*, 62 Fed. Reg. 18,404, (Dep't Commerce Apr. 15, 1997)..............................16

*Certain Frozen and Canned Warmwater Shrimp From Brazil*, 69 Fed. Reg. 76,910
    (Dep't Commerce Dec. 23, 2004)...................................................................4

*Certain Oil Country Tubular Goods From the Republic of Korea*, 84 Fed. Reg.
    24,085 (Dep't Commerce May 24, 2019) at 83 .................................................14

*Certain Welded Carbon Steel Pipes and Tubes from Thailand*, 63 Fed. Reg. 55,578,
    (Dep't Commerce Oct. 16, 1998) ...................................................................5

*Corrosion-Resistant Steel Products From the Republic of Korea*, 84 Fed. Reg.
    48,118 (Dep't Commerce Sept. 12, 2019) ........................................................16

**Other Authorities**

Federal Reserve System, https://www.federalreserve.gov/releases/e2/
    (last accessed December 3, 2021)..................................................................22

Import Administration Policy Bulletin 98.2, *Imputed Credit Expenses and Interest
    Rates* (Feb. 23, 1998),
    https://access.trade.gov/Resources/policy/bull98-2.htm........................18, 19, 20, 21

## I.  **INTRODUCTION**

On behalf of the Coalition of American Millwork Producers ("CAMP"), we respectfully submit the following reply to the response briefs filed by Defendant the United States ("the Government") and Defendant-Intervenor Araupel S.A ("Araupel").  *See* Def.'s Opp'n to Pl.'s Rule 56.2 Mot. for J. on the Agency R. (Nov. 5, 2021), ECF No. 28 ("Def. Brief"); Def.-Int. Araupel S.A.'s Mem. in Opp'n to Pl.'s Rule 56.2 Mot. for J. upon the Agency R. (Nov. 5, 2021), ECF No. 26 ("Araupel Br.").

## II.  **ARGUMENT**

This appeal arises from the U.S. Department of Commerce's ("Commerce") final negative determination in the antidumping duty ("AD") investigation on wood mouldings and millwork products ("WMMP") from Brazil.  *See Wood Mouldings and Millwork Products From Brazil*, 86 Fed. Reg. 70 (Dep't Commerce Jan. 4, 2021) (final neg. deter. of sales at less than fair value) ("*Final Determination*"), P.R. 409, and accompanying Issues and Decision Memorandum (Dec. 28, 2020), P.R. 400[1]  CAMP has appealed (1) Commerce's determination to collapse all three mandatory respondents into a single entity; (2) Commerce's failure to find Araupel unaffiliated with its log supplier and thus failure to apply the major input rule to adjust Araupel's log purchases; (3) Commerce's adjustment of Araupel's reported costs by the fair value adjustment pertaining to unharvested forests; and (4) Commerce's selection of the rate to impute Araupel's credit and inventory carrying expenses.

---

[1]      In this brief, documents contained in the public administrative record are identified by name and date, followed by "P.R.", followed by the corresponding administrative record number. Documents contained in the confidential administrative record are identified by name and date, followed by "C.R.", followed by the corresponding administrative record number.

**A.** **Commerce's Determination to Collapse Araupel with Braslumber/BrasPine Was Unsupported by Substantial Evidence and Inconsistent with Law**

Commerce erred in collapsing Araupel and Braslumber Industrias de Molduras Ltda. ("Braslumber")/Braspine Madeiras Ltda. ("BrasPine") into a single entity, resulting in a negative final determination for the investigation, despite there being no significant potential for the manipulation of price or production among the parties.  *See* P.R. 400 at cmt. 1.  In fact, <u>no</u> party argued prior to Commerce's preliminary determination that Araupel and Braslumber/BrasPine should be collapsed.  To the contrary, both respondent parties repeatedly emphasized their independence from one another.  Only after Commerce's preliminary decision to collapse resulted in a negative preliminary determination did Araupel change its position.  *See* Araupel Rebuttal Brief (Nov. 23, 2020), C.R. 338, P.R. 389 at 8-28.  Even then, Braslumber/BrasPine continued to argue that the two parties should not be collapsed.  *See* Braslumber/BrasPine Case Br. (Nov. 13, 2020), C.R. 335, P.R. 384 at 4-14.  Araupel's and Braslumber/BrasPine's diametrically opposed positions on this very issue of collapsing at the briefing stage only further emphasize the parties' lack of alignment on major strategic decisions, in additional to their production, management and operational independence.

       **1.** **Affiliation**

In defense of Commerce's action, the Government and Araupel first argue that Araupel and Braslumber/BrasPine were affiliated – the first of three requirements for collapsing.  Def. Brief at 17-18; Araupel Br. at 12-15.  While CAMP strongly disagrees with this position, in the interests of limiting the issues brought before the Court, CAMP did not appeal the affiliation issue and assumed *arguendo* that such requirement was satisfied.  *See* CAMP's Memo. In Supp. of Rule 56.2 Mot. for J. Upon the Agency R. (Aug. 9, 2021), ECF No. 20 at 21 ("CAMP Opening Br.");

Def. Br. at 21.   Thus, these portions of Defendant's brief and Araupel's brief are unnecessary to address.

### 2.       Substantial Retooling

With regard to the second requirement for collapsing – whether the parties have production facilities for similar or identical products that would not require substantial retooling to restructure manufacturing operations – Defendant and Araupel note that both Araupel and Braslumber/BrasPine produce the same or similar products in similar mill facilities.   Def. Br. at 18-19; Araupel Br. at 16-17.   CAMP does not contest this, but again notes that it is unclear how this fact supports a collapsing determination when the companies at issue are both mandatory respondents in an investigation.   When the two companies are mandatory respondents, it is essentially a given that both companies have production facilities for similar products – the subject merchandise.   The companies' ability to produce subject merchandise is of course whey they were selected as mandatory respondents in the first place.   Here, there was no indication that the parties would use these similar facilities to restructure manufacturing priorities, and Commerce provided no analysis on that point.

### 3.       Significant Potential for the Manipulation of Price or Production

The third requirement for collapsing, and the crux of the issue on appeal, is whether there existed a significant potential for the manipulation of price or production between the two companies.   *See* 19 C.F.R. § 351.401(f)(2).   To determine whether such a significant potential exists, Commerce may consider: (i) the level of common ownership; (ii) the extent to which managerial employees or board members of one company sit on the board of directors for an affiliated company; and (iii) whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**        NON-CONFIDENTIAL VERSION

employees, or significant transactions between the affiliated producers. *Id.* Again, before Commerce's negative preliminary determination, <u>no</u> party argued that there was a significant potential for the manipulation of price or production between Araupel and Braslumber/BrasPine. Araupel alone changed its position, only after realizing the beneficial results of collapsing on its dumping margin.

### a.    The Level of Common Ownership

First, with regard to the level of common ownership, Defendant acknowledges that the [          ] family grouping owns [          ] of Araupel only through <u>indirect</u> ownership of a parent company. Def. Br. at 23. *See also* Araupel Br. at 19. Indeed, directly, the [          ] family group owned only [     ]% of Araupel. Preliminary Affiliation/Collapsing Memo (Aug. 5, 2020), C.R. 279, P.R. 314 at 9. Defendant cites to *U.S. Steel Corp. v. United States*, 179 F. Supp. 3d 1114, 1139 (Ct. Int'l Trade 2016), an appeal of the Oil Country Tubular Goods ("OCTG") from India AD investigation, as support for the proposition that "{n}othing in the regulation or Commerce's practice indicates that indirect ownership may not support collapsing affiliated companies." Def. Br. at 23. While the CIT did acknowledge that point in *U.S. Steel Corp.*, it also stated with regard to the common ownership factor: "Moreover, Commerce . . . concluded that the {family grouping's} <u>control was more active than that of other shareholders</u>." *U.S. Steel Corp.*, 179 F. 3d at 1139 (emphasis added). On this point, the CIT further cited Commerce's findings in *Shrimp from Brazil*. *See id.* In that case, Commerce does not appear to have discussed indirect vs. direct ownership interests at all. *See* Issues and Decision Memorandum accompanying *Certain Frozen and Canned Warmwater Shrimp From Brazil*, 69 Fed. Reg. 76,910 (Dep't Commerce Dec. 23, 2004) (notice of final deter. of sales at less than fair value) at 13-15. Rather, as in OCTG

**BUSINESS PROPRIETARY INFORMATION**
                                    **HAS BEEN DELETED**

from India, Commerce focused on the fact that one company was "largely <u>controlled</u> by the two individuals who own{ed} and manage{d}" the second company. *Id.* at 14 (emphasis added).

In this case, the facts were significantly different. None of the [         ] family grouping shareholders actively controlled Araupel at all. As reported, these shareholders were not "involved in the management, production and sale of {subject merchandise} by Araupel or any other entity," nor did they have "business transactions with Araupel during the period of investigation {("POI")}." Araupel AQR (Apr. 8, 2020), C.R. 37-44, P.R. 161-163 at A-8–A-9. *See also* Braslumber AQR (Apr. 8, 2020), C.R. 46-58, P.R. 164-167 at 16 (Braslumber/BrasPine reporting that "each company operates entirely separate from the other"). Thus, unlike in other cases that Commerce has considered, any common ownership in this investigation was indirect and did not lead to any common control of the two companies. Given this, combined with the overwhelming evidence that Araupel and Braslumber/BrasPine maintained wholly distinct operations, the level of common ownership factor did not support a finding of a significant potential for the manipulation of prices or production. As Commerce has previously explained, common equity interests alone are not a sufficient basis to collapse. *Certain Welded Carbon Steel Pipes and Tubes from Thailand*, 63 Fed. Reg. 55,578, 55,582 (Dep't Commerce Oct. 16, 1998) (final results of antidumping duty admin. rev.).

> **b.    The Extent to Which Managerial Employees or Board Members of One Company Sit on the Board of Directors for an Affiliated Company**

Second, Defendant and Araupel turn to the extent to which managerial employees or board members of one company sat on the board of directors for the affiliated company. *See* Def. Br. at 23-25; 19 C.F.R. § 351.401(f)(2)(ii). Neither Defendant nor Araupel dispute the fact that Araupel and Braslumber/BrasPine shared <u>no</u> individual managers, employees or Board members during

the POI.  *See, e.g.*, C.R. 279, P.R. 314 at 9 (Araupel reporting "that it has no overlapping management or employees with Braslumber and BrasPine"); C.R. 46-58, P.R. 164-167 at 16 (Braslumber/BrasPine reporting that "none of the managers or employees of BrasPine or Braslumber also work at Araupel.  Similarly, none of the members of {Braslumber/BrasPine's} board of directors is also a member of Araupel's board of directors, or is otherwise involved with the operations of Araupel.").  Indeed, [

], or vice versa.  Araupel 3SAQR (July 16, 2020), C.R. 271, P.R. 300 at Exhibit S3A-2.  Rather, Commerce's finding of shared management and Board membership between Araupel and Braslumber/BrasPine was based solely on its consideration of every member of the [     ] family as a single, family grouping "person."  P.R. 400 at 12-14.

As explained in CAMP's opening brief, this Court analyzed, and remanded, a similar finding by Commerce in *Jinko Solar Co. v. United States*, 229 F.Supp.3d 1333 (Ct. Int'l Trade 2017) ("*Jinko I*").  *See* CAMP Opening Br. at 25.  The Court stated that "Commerce's collapsing regulation calls upon it to consider overlap of underlined individual board member between collapsed entities."  *Jinko I*, 229 F. Supp. 3d at 1344.  Araupel also acknowledges that the Court in that case required Commerce to at least "assess the level of crossover between individual management and board members."  Araupel Br. at 21 n.1 (emphasis in original).  Defendant responds by noting that the factors under 19 C.F.R. § 351.401(f)(2) are non-exhaustive, and Commerce was justified in considering a family unit sitting on both Boards, as essentially a separate and additional factor.  *See* Def. Br. at 24-25.  But that is not what Commerce stated that it was doing.  If the agency purports to undertake an analysis different than that set forth in its regulations, it should clearly explain that it is doing so, and why.  The Court should remand Commerce's determination for the

agency to make a finding regarding the specific factor in its regulations – whether there is an overlap of any individual Board member or member of management between Araupel and Braslumber/BrasPine. Commerce will undoubtedly find that there is not, as "Araupel has a completely independent and non-overlapping board of directors, and completely independent and non-overlapping management and employees." C.R. 37-44, P.R. 161-163 at A-14. Once that finding is properly made, Commerce will have concluded that – at a minimum – two out of the three factors set forth in its regulations indicate that there is no significant potential for the manipulation of price or production between Araupel and Braslumber/BrasPine.

### c.      Intertwined Operations

Third, Defendant acknowledges that Commerce itself found an "absence of intertwined operations between Araupel and Braslumber/BrasPine," which "weigh{ed} against a finding of collapsing." P.R. 400 at 9; C.R. 279, P.R. 314 at 10. *See also* Def. Br. at 25-27. However, Defendant argues, "not collapsing based solely on the absence of intertwined operations would be counter to the principle that no single factor is dispositive." *Id.* at 25. Defendant fails to acknowledge the critical importance of the "intertwined operations" factor to a collapsing determination, and it fails to acknowledge that the other evidence Commerce found to outweigh the lack of intertwined operations was based on the mistaken and erroneous findings discussed above and in CAMP's opening brief. The substantial record evidence that even the agency found to indicate a lack of intertwined operations in fact also indicated a lack of any substantial potential for manipulation of price or production.

Defendant also argues that CAMP "invites the Court to reweigh the evidence or substitute its judgment for that of the agency." *Id.* CAMP disagrees. CAMP rather asks the Court to find that Commerce's collapsing determination was not supported by substantial evidence, taking into

account "whatever in the record fairly detracts" from the evidence adduced in support of the agency's conclusion, and to find that Commerce failed to grapple with all "important aspect{s} of the problem" before it.  19 U.S.C. § 1516a(b)(1)(B)(i); *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Overall, an agency's decision is only supported by substantial record evidence if it is reasonable, *see Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006), and Commerce's collapsing determination here was not reasonable. As CAMP set forth in its opening brief, it was unreasonable for Commerce to determine that collapsing was appropriate given respondents' own repeated statements emphasizing their separate and independent operations and business strategies:

- Braslumber/BrasPine: "Unlike the nearly fully intertwined relationship between BrasPine and Braslumber, Araupel is, and operates as, a completely separate entity with no sales or commercial overlap with either BrasPine or Braslumber whatsoever."  C.R. 46-58, P.R. 164-167 at 15.

- Braslumber/BrasPine: "From the production perspective, {Braslumber/BrasPine} and Araupel are entirely separate," noting that "{t}he companies maintain separate factories in different locations, and they do not share production workers." *Id.* at 16-17.

- Braslumber/BrasPine: "each company pursues entirely separately commercial strategies. The companies do not share pricing information, customer lists or commercial strategies, and they do not make joint sales calls with common customers."  *Id.* at 16.

- While Araupel now argues "that the operations of Araupel and Braslumber/BrasPine were in fact intertwined in several key respects during the POI," Araupel Br. at 23, this differs substantially from the company's position in its questionnaire responses to the agency. There, Araupel stated that it "has completely independent finances, completely independent production facilities and purchasing operations, completely independent company-owned forestry assets, and completely independent sales and distribution operations and personnel" and that it "does not share sales information, customer lists, cost and production information, or research and development information with {Braslumber/BrasPine} and there is no shared involvement between the companies in production, pricing, and sales decisions." C.R. 37-44, P.R. 161-163 at A-14.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Despite Commerce's correct conclusion regarding a lack of intertwined operations, acknowledging that Araupel and Braslumber/BrasPine did not share production or distribution processes, facilities, sales strategies, finances or non-managerial employees, Commerce improperly found that the totality of the circumstances nevertheless supported collapsing. P.R. 400 at 14. Defendant's assertion that the [          ] family group, "with its levels of ownership and decision-making positions in management and the board, was positioned to coordinate its actions to direct the three companies to act in concert or out of common interest" is contradicted by the record evidence that shows complete independence between the two companies and a total lack of control over Araupel by any individual that controlled Braslumber/BrasPine. Def. Br. at 26. And Araupel's assertion that a transaction between itself and Braslumber/BrasPine to "[

          ]" supported a reasonable inference of a potential for similar arrangements in the future ignores the record facts with regard to this transaction. Araupel Br. at 23. The relevant transaction was [            ] to support any such contention. Braslumber/BrasPine purchased an [            ] amount of lumber from Araupel during the POI, representing [      ] of the total volume of [              ] Braslumber/BrasPine produced and purchased during the period. C.R. 46-58, P.R. 164-167 at 17. This [    ] transaction merely emphasizes the extent to which the two companies operated separately.

Defendant concedes that there is no evidence of actual manipulation, but then argues that a citation by CAMP to *Jinko I* with regard to future intertwined operations was inapposite. *See* Def. Br. at 26-27. *See also* Araupel Br. at 24-25. CAMP explained that the "Court has accepted Commerce's reliance on the possibility of future manipulation only when it is based in evidence of actual manipulation, during or prior to the POI." CAMP Opening Br. at 28. Where the agency relies on past actual manipulation to infer future potential manipulation, "Commerce must say so

and explain why such an inference is reasonable based on the record before it." *Jinko I*, 229 F. Supp. 3d at 1347.   Defendant argues that this is irrelevant because, in the underlying case, "Commerce has not relied on evidence of actual manipulation, either prior to or during the POI, to support its finding that there is a significant potential for manipulation" in the future.   Def. Br. at 27.   The fact that Commerce has <u>no</u> evidence of actual manipulation – either prior or current – to support its finding of future manipulation does not bolster Defendant's position.   Rather, it highlights that Commerce's finding of a capability for future intertwined operation was unsupported by substantial evidence.   While CAMP acknowledges that "{t}he emphasis in the regulation is on the potential for, not actual, manipulation," *Id.* (citing *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,346 (Dep't Commerce May 19, 1997) (Preamble)), Commerce must support its finding regarding the significant potential for manipulation with substantial evidence, and it failed to do so here.

### 4.      Consistency with the Purpose of the Collapsing Provision

Finally, Defendant and Araupel disagree with CAMP's statement in its opening brief that the negative collapsing determination was inconsistent with the purpose of the statute.   *See id.* at 27-29; Araupel Br. at 25-26.   Indeed, the U.S. Court of Appeals for the Federal Circuit has recently explained that "{t}he purpose of collapsing multiple entities into a single entity is to prevent affiliated entities from circumventing antidumping duties by channeling production of subject merchandise through the affiliate with the lowest potential dumping margin." *Prosperity Tieh Enter. Co. v. United States*, 965 F.3d 1320, 1323 (Fed. Cir. 2020) (internal quotation omitted). "Commerce's authority to collapse arises out of '{Commerce's} responsibility to prevent circumvention of the antidumping law.'" *Id.* (citing *Queen's Flowers de Colom. v. United States*, 21 CIT 968, 972, 981 F.Supp. 617, 622 (1997)).   Commerce itself in the final determination

explained that collapsing "is an important enforcement tool that enables Commerce to prevent foreign companies from potentially circumventing trade remedies by manipulating price and production decisions <u>after the imposition of an order</u> (*e.g.*, by channeling merchandise sales through affiliates with lower margins)."  P.R. 400 at 9 (emphasis added).  As such, applying the collapsing provision in order to <u>avoid</u> the imposition of an order contradicts the purpose and intent of the statute.

CAMP argued that Commerce's application of the collapsing provision in this case "had the perverse result of preventing the issue of the AD order in the first place, thus denying the domestic industry any relief whatsoever from unfairly traded Brazilian imports."  CAMP Opening Br. at 30-31.  Defendant states that "this argument presupposes that dumping is occurring in the first place," which is not indicated by the record because the "zero rate determined for the collapsed entity is presumed to be representative for all other companies that were not selected for individual examination."  Def. Br. at 27.  Araupel similarly notes that the collapsing determination is not what terminated the investigation, but rather the collapsed entity's *de minimis* dumping margin.  Araupel Br. at 26.  But, based on the record evidence, CAMP notes that without the collapsing decision, at least one of the mandatory respondents would have received a positive dumping margin, resulting in an affirmative determination by Commerce for a majority of the Brazilian industry.  Araupel is plainly aware of this fact, given its ardent support – only after it realized that collapsing would provide it a *de minimis* margin – for Commerce's collapsing determination.  C.R. 338, P.R. 389 at 8-28; Araupel Br. at 11-26.  Yet Commerce's collapsing decision had the effect of excluding the entire Brazilian industry from duties.  This is directly contrary to the purpose of the collapsing provision to prevent circumvention of the antidumping law, and to Commerce's duty to calculate dumping margins as accurately as possible.  As such, Commerce's determination

BUSINESS PROPRIETARY INFORMATION
                HAS BEEN DELETED

should be remanded to the agency.  *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191

(Fed. Cir. 1990).

     **B.**     **Commerce Improperly Adjusted Araupel's Reported Costs by the Fair Value Adjustment Pertaining to Unharvested Forests**

     Commerce acted unreasonably and contrary to law in adjusting Araupel's reported general

and administrative ("G&A") expenses to include a fair value adjustment for its unharvested forests,

because the adjustment did not reasonably reflect costs associated with the production and sale of

subject merchandise.  According to section 773(f)(1)(A) of the Tariff Act of 1930, Commerce will

normally calculate costs "based on the records of the exporter or producer of the merchandise, if

such records are kept in accordance with the generally accepted accounting principles of the

exporting country (or the producing country, where appropriate) and <u>reasonably reflect the costs

associated with the production and sale of the merchandise</u> . . . ."  19 U.S.C. § 1677b(f)(1)(A)

(emphasis added).

     Araupel reported that [

     ], and that this [

     ].  Araupel DQR (May 14, 2020), C.R. 111-115,

P.R. 201 at D-15.  As explained in CAMP's opening brief, there were two types of adjustments:

one to the cost of logs consumed during the POI (the "wood fair value adjustment") and the other

merely reflecting an increase in the future realizable value that Araupel hopes to make on

unharvested wood (the "unharvested forest fair value adjustment").  *See* P.R. 400 at 37; Araupel

DSQR (July 1, 2020), C.R. 194-205, P.R. 274-275 at SD-25; C.R. 111-115, P.R. 201 at D-48.

CAMP thus argued that the second adjustment was unwarranted, as the growing of logs is a

separate business operation from the production of WMMP, and it is not typical of general

activities experienced by companies.  As Defendant explains, including the unharvested forest fair

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

value adjustment significantly decreased Araupel's G&A expense ratio from [      ]% to only [      ]%. Def. Br. at 39.  Preliminary Determination Margin Calculation (Aug. 5, 2020), C.R. 280, P.R. 322 at 2, Attachment 1.

Defendant and Araupel argue that Commerce's G&A expense calculation was reasonable because the adjustment was included in Araupel's audited financial statements, which were found to be compliant with Brazilian GAAP, and record evidence did not demonstrate that the financial statements were distortive or did not reasonably reflect the cost of producing and selling the merchandise.  Def. Br. at 39; Araupel Br. at 35-36.  But, unlike the wood fair value adjustment, the unharvested forest fair value adjustment did not reasonably reflect the cost of producing and selling the merchandise, as required by the statute, because it did not reflect production or sales at all.  The <u>unharvested</u> forests had no effect on the POI production or sales costs for subject merchandise and, therefore, should not have been used in the cost calculations in this investigation.

Defendant further argues that the wood fair value adjustment and unharvested forest fair value adjustment were "intrinsic{ally} link{ed}," because the unharvested forest fair value adjustment increases the value of the logs that are ultimately harvested from those forests.  Def. Br. at 40.  *See also* P.R. 400 at 38; Araupel Br. at 37.  However, the value of the logs that were harvested and consumed during the POI are already properly valued by making the wood fair value adjustment.  No further adjustment is needed, or warranted, to assets unrelated to the cost of producing or selling the subject merchandise during the POI.

CAMP also disagrees with Defendant's contention that "CAMP acknowledges that the cost calculation in this case is consistent with Commerce's prior practice."  Def. Br. at 40.  That is incorrect.  Rather, CAMP stated that Commerce cited only one single case in support of its treatment of Araupel's adjustments.  *See* CAMP Opening Br. at 40.  Araupel cites that same, single

BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

case here.  Araupel Br. at 36.  This one case did not constitute a practice, as Defendant itself acknowledges later in its brief.  *See* Def. Br. at 44-45 ("one decision alone does not constitute a practice . . . ").  And Commerce "is not obligated to 'accept an incorrect methodology and perpetuate a mistake because it was accepted' in previous proceedings."  Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods From the Republic of Korea*, 84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019) at 83.

In sum, Commerce erred by making a fair market adjustment to Araupel's unharvested forests, because that adjustment did not reflect the costs associated with the production and sale of subject merchandise, as required by the statute.

### C.   Commerce's Failure to Apply the Major Input Rule and Adjust Araupel's Log Purchases Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law

Commerce committed error by not applying the major input rule to Araupel's log purchases from [                                             ].   Araupel  purchased logs—[                    ]—from [                    ] (*i.e.*, "Company A"), which was [                                                                                              ] (*i.e.*, "Company B") and thus affiliated with Araupel.  C.R. 111-115, P.R. 201 at D-10;  C.R. 37-44, P.R. 161-163 at A-11 n.4.  Araupel also maintained a close supplier relationship with Company A such that Company A was [                    ] on Araupel, and vice versa.  *See* Araupel SAQR (May 22, 2020), C.R. 119-123, P.R. 242 at SA-4 – SA-5, Exhibit SA-2; Araupel 2SAQR (July 6, 2020), C.R. 250-251, P.R. 279 at S2A-2.  However, as set forth in CAMP's opening brief, Commerce improperly determined that Araupel was not affiliated with Company A, and its decision not to apply the major input rule and adjust Araupel's log purchases was unsupported by substantial evidence and inconsistent with law.  *See* P.R. 400 at 41.

BUSINESS PROPRIETARY INFORMATION
                    HAS BEEN DELETED

Defendant argues that Commerce properly found Araupel and Company A to be unaffiliated. *See* Def. Br. at 32-36. First, it acknowledges that Araupel was in a JV with Company B (the whole owner of Company A), but states that the JV agreement "did not show that Araupel or Company A was in a position to exercise restraint or direction over the other and that the arrangement under the agreement had the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise." *Id.* at 32. Whether or not it was "not uncommon in Brazil for land and forest assets to be separately owned," *see id.*, is inapposite. As Defendant recognizes, the JV agreement between Araupel and Company B is what permitted Company B to maintain its timber investments in Brazil, giving Araupel control over Company B. *Id.* Moreover, both Araupel and Company B were joint owners in the companies that held the land where Company B's timber investments were located. *Id.* at 32-33. Company B wholly owned Company A. And prior to the POI, [

] Company A. C.R. 37-44, P.R. 161-163 at A-11 n.5. As such, Araupel was legally and operationally in a position to exercise restraint and discretion over the production and sales of logs by Company A, through the JV that was of critical importance to Company A's sole owner. Moreover, the relationship between the JV partners had an obvious potential to impact decisions concerning the production, pricing, or cost of the subject merchandise during POI. Log purchases are [                              ] for Araupel in manufacturing subject merchandise. C.R. 194-205, P.R. 274-275 at SD-4. Any decisions concerning the supply of logs significantly and directly impact the production and sale of subject WMMP.

Defendant cites *Corrosion Resistant Steel Products* ("*CORE*") *from the Republic of Korea* as a decision that similarly "found no affiliation between companies that entered into a joint venture agreement and had a buyer-supplier relationship." Def. Br. at 33. In *CORE from Korea*,

the respondent held 30% of the JV, the relevant supplier held 20% of the JV, and a <u>third party</u> held

a controlling share – the remaining 50% – the JV.   Preliminary Decision Memorandum

accompanying *Corrosion-Resistant Steel Products From the Republic of Korea*, 84 Fed. Reg.

48,118 (Dep't Commerce Sept. 12, 2019) (prelim. results of antidumping duty admin. review and

preliminary Determination of No Shipments; 2017-2018) at 11 ("*CORE from Korea* Prelim.

Decision Memo").   This JV is much different: [


       ] – giving each party [           ] control.[2]  C.R. 37-44, P.R. 161-163 at 11; C.R. 250-

251, P.R. 279 at Exhibit S2A-1, pp. 14-15.[3]

       Second, Defendant argues that Commerce correctly found Araupel and Company A not to

be affiliated based on a close supplier relationship.   Def. Br. at 34-36.   In so arguing, Defendant

states that "CAMP's challenge to Commerce's finding of no affiliation relies almost entirely on

the unsupported view that Company A was Araupel's exclusive log supplier during the POI."  *Id.*

at 34.   This is an incorrect restatement of CAMP's argument.   As noted above, CAMP argues that

Araupel and Company A are affiliated based on Araupel's JV with Company A's 100% owner,

Company B.   CAMP further argues that Araupel and Company A are affiliated based on a close

supplier relationship, which can – but need not – reflect a fully exclusive supplier relationship.   It

simply must mean that the relationship is "so significant that it could not be replaced," and that

was true for Araupel and Company A during the POI.   *Certain Cold-Rolled and Corrosion-*

---

[2]       Moreover, as Commerce noted in the *CORE from Korea* preliminary decision
memorandum, information relating to the JV agreement in that case was largely business
proprietary and discussed in a confidential memorandum, limiting that case's utility to the issue at
hand.  *CORE from Korea* Prelim. Decision Memo at 12.

[3]       [                                           ].  C.R. 250-251, P.R. 279 at S2A-2.

*Resistant Carbon Steel Flat Products From Korea*, 62 Fed. Reg. 18,404, 18,417 (Dep't Commerce Apr. 15, 1997) (final results of antidumping duty admin. reviews). *See also U.S. Steel Corp.*, 179 F. 3d at 1132.

In the underlying investigation, Araupel [                                        ] during the POI. C.R. 119-123, P.R. 242 at Exhibit SA-2. While "various companies {} supplied logs to Araupel," Def. Br. at 34, [

                     ] to Araupel. C.R. 119-123, P.R. 242 at Exhibit SA-2. Araupel did not report what portion of its logs came from [                     ] – information that Commerce should have collected to perform the affiliated party input adjustment. Moreover, it appears that Company A had no other operations except to [                     ]. While Defendant claims that "CAMP has not identified any record evidence to show that Company A exclusively sold its logs to Araupel during the POI," Def. Br. at 34, Araupel stated in its supplemental Section A questionnaire response: "Araupel harvested logs for use in the production of WMMP that were owned by [                     ] on land owned by [                                        ], and other Brazilian entities. Araupel is not aware of any other operations by [                     ]." C.R. 119-123, P.R. 242 at SA-4 – SA-5. Particularly given that Araupel and Company B have a JV established in order to permit Company A to supply logs, this statement reasonably serves as evidence that Company A exclusively sold its logs to its parent company's JV partner – Araupel.

Commerce failed to reach a reasonable conclusion with regard to Araupel and Company A's affiliation, and also failed to undertake a thorough analysis of the affiliation issue. Defendant does not address the agency's failure to conduct a comprehensive analysis in its response brief. *See generally* Def. Br. Yet, Commerce did not fully consider the extent to which the close supplier relationship between Araupel and [                     ] amounted to affiliation such that the major

17

input rule should have been applied. *See* P.R. 400 at 40-41. Instead, Commerce merely concluded

that "Araupel has sufficiently demonstrated that it does not have ownership over {[

         ]}, nor that the {JV} has the potential to impact decisions concerning the production,

pricing, or cost of subject merchandise." *Id.* at 41; Affiliated Companies Memorandum (Dec. 28,

2020), C.R. 341, P.R. 401. The agency's analysis ignored the significant evidence appearing to

show that [                                                                    ]. *See* P.R. 400 at 40-41; C.R.

119-123, P.R. 242 SQR at SA-5, Exhibit SA-2. In this regard, Commerce's determination was

contrary to the substantial record evidence showing the close relationship between Araupel and

[                    ], and also failed to follow the required legal framework. Accordingly, the Court

should instruct Commerce to reconduct its deficient affiliation analysis and, upon finding

affiliation, to apply the major input rule.

### D.   Commerce's Selection of the Rate to Impute Araupel's Credit and Inventory Carrying Cost Expenses Was Improper

The Court should remand Commerce's selection of the rate used to impute Araupel's credit

and inventory carrying cost expenses, as Commerce's rate selection was inconsistent with the

requirements of Policy Bulletin 98.2, inadequately explained, and otherwise unreasonable. As

Defendant describes, *see* Def. Br. at 41, Commerce has a longstanding practice of imputing a U.S.

credit expense and a foreign market credit expense on each sale based on "the amount of interest

that the sale revenue would have earned between date of shipment and date of payment." *See*

Import Administration Policy Bulletin 98.2, *Imputed Credit Expenses and Interest Rates* (Feb. 23,

1998), https://access.trade.gov/Resources/policy/bull98-2.htm ("Policy Bulletin 98.2"). The

imputation of credit expenses "must correspond to a dollar figure reasonably calculated to account

for such value during the gap period between delivery and payment." *LMI—LA Metalli*

*Industriale, S.p.A. v. United States*, 912 F.2d 455, 460-61 (Fed. Cir. 1990). The seller "is

effectively lending {the currency of the sale} to its purchaser between the time it ships the merchandise and the time it receives payment." Policy Bulletin 98.2.

To calculate U.S. credit expenses and inventory carrying costs for purposes of this adjustment, Commerce normally relies on the interest rate for the respondent's short-term borrowings in U.S. dollars. *Id.* Where the respondent does not have any such short-term borrowings, as in this case, *see* Araupel Br. at 39, Commerce uses "the Federal Reserve's weighted-average data for commercial and industrial loans maturing between one month and one year from the time the loan is made." Policy Bulletin 98.2. Commerce has found that such data meets three criteria applicable to the selection of a short-term borrowing rate: the data are (1) reasonable, (2) readily obtainable and predictable, and (3) reflect "a short-term interest rate actually realized by borrowers in the course of 'usual commercial behavior' in the United States." *Id.* Policy Bulletin 98.2 contains a link to the Survey of Terms of Business Lending ("STBL"), indicating that this survey constitutes the appropriate source for such data. *Id.*

Here, Araupel reported its credit expenses and inventory carrying costs not based on the STBL, or its replacement survey, the Small Business Lending Survey ("SBLS"), but on the effective federal funds rate published by the Federal Reserve Bank of New York – a rate of 2.16%. *See* Araupel BCQR (May 6, 2020), C.R. 105-107, P.R. 192 at Exhibit C-17 (citing Fed. Rsrv. Bank of N.Y., *Effective Federal Funds Rate*, and referring to "EFFR"); Araupel Br. at 39. CAMP submitted data from the SBLS, the official replacement of the discontinued STBL – a rate of 5.73%. *See* May 20 Comments (May 20, 2020), C.R. 116-117, P.R. 205-206 at Exhibits 1-2. In its final determination, Commerce stated that its selection between these two data sources was guided by the three criteria described in Policy Bulletin 98.2, but then found that the SBLS did not

meet these criteria.  P.R. 400 at 50.  Specifically, Commerce found that the SBLS's data pertained to "loans by small businesses," but that Araupel was not a small business.  *Id.*

In defense of Commerce's selection, Defendant first notes that "CAMP makes much of Commerce's statement that the SBLS short-term interest rate pertained to 'loans by small businesses' because the record shows that the loans were made by banks," arguing that the "loans by small businesses" reference includes a typographical error and was intended to state "loans to small businesses."  Def. Br. at 43.  *See also* Araupel Br. at 41.  While CAMP disputes that it "made much" of this statement (referring to it in only two brief sentences), CAMP Opening Br. at 42, it is also not clear from the record that this statement was a mere typographical error.

Next, in response to CAMP's argument that Commerce did not explain why Araupel's proffered 2.16% rate met the criteria in Policy Bulletin 98.2, Defendant appears to recognize that "an explicit and comprehensive discussion" was "absen{t}" from the record, but states that "Commerce is presumed to have adequately considered the issue and all the evidence in the record in making its decision."  Def. Br. at 43.  While Commerce is not required to outline every detail of the evidence on which it relies, the basis for the agency's "decision must be reasonably discernible to a reviewing court."  *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) (citing *Motor Vehicle M$_f$rs.*, 463 U.S. at 43).  Here, it was not.  Specifically, Commerce did not explain how the rate reflected "the Federal Reserve's weighted-average data for commercial and industrial loans maturing between one month and one year from the time the loan is made."  P.R. 400 at 48; Policy Bulletin 98.2.  The 2.16% rate was derived from the effective federal funds rate, which "consists of domestic unsecured borrowings in U.S. dollars by depository institutions from other depository institutions and certain other entities, primarily government-sponsored enterprises."  C.R. 105-107, P.R. 192 at Exhibit C-17.  While Araupel described this as a "short-

term" interest rate, the rate does not correspond to "data for commercial and industrial loans." C.R. 105-107, P.R. 192 at Exhibit C-17; Policy Bulletin 98.2. Araupel merely responds that "there is no doubt that the {2.16%} interest rate reflects an average of a broad range of short-term commercial borrowings from banks," Araupel Br. at 42, with no supporting evidence or citations to the record. In fact, it is not discernible from the record or Commerce's Issues and Decision Memorandum how the agency concluded that the 2.16% rate complied with Policy Bulletin 98.2's requirements.

Next, Araupel argues that the SBLS rate was improper because it pertains to loans to small businesses, which Araupel is not. Araupel Br. at 40. But that is not a criterion set out in Policy Bulletin 98.2, which specifically refers to the predecessor survey of the SBLS. Indeed, the Department has previously relied on the SBLS rate where a respondent did not meet the "small business" definition, because the agency specifically found that the SBLS satisfies the criteria laid out in Policy Bulletin 98.2. Issues and Decision Memorandum accompanying *4th Tier Cigarettes From the Republic of Korea*, 85 Fed. Reg. 79,994 (Dep't Commerce Dec. 11, 2020) (final affirm. deter. of sales at less than fair value, and final neg. deter. of critical circumstances) at 41-43.

Araupel further takes issue with what it calls CAMP's "incorrect claim that the SBLS rate . . . 'replaced' the STBL rate previously referenced by Commerce in Policy Bulletin 98.2." Araupel Br. at 40. Araupel states that it is simply not true that the SBLS "replaced" the STBL. *Id.* CAMP points Araupel to STBL's website, which states:

> The Board of Governors has discontinued the Survey of Terms of Business Lending (STBL) and the associated E.2 release. The final STBL was conducted in May 2017, and the final E.2 was released on August 2, 2017. The STBL has been replaced by a new Small Business Lending Survey that commenced in February 2018. The new survey is being managed and administered by the Federal Reserve Bank of Kansas City. Results from this new survey can be found here.

Board of Governors of the Federal Reserve System, https://www.federalreserve.gov/releases/e2/ (last accessed December 3, 2021) (emphasis added). CAMP's statement was correct.

With regard to the remainder of CAMP's arguments, Defendant addresses them substantively in a single sentence, relying primarily on a failure to exhaust administrative remedies claim. *See* Def. Br. at 45-46. But CAMP presented its argument "with reasonable clarity and avail{ed} the agency with an opportunity to address it." *Luoyang Bearing Corp. v. United States*, 28 CIT 733, 761, 347 F. Supp. 2d 1326, 1352 (2004). *See China Steel Corp. v. United States*, 27 CIT 715, 741, 264 F. Supp. 2d 1339, 1364 (2003). Regardless, the Court should use its discretion to determine that a substantive decision on CAMP's arguments is appropriate, *see Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1364 (Fed. Cir. 2019), and it should, as a result of these arguments as outlined in CAMP's opening brief, remand Commerce's selection of the imputed interest rate.

## III.  **CONCLUSION**

For the reasons detailed above and in its opening brief, CAMP respectfully submits that this Court should remand the final determination of Commerce's AD investigation into WMMP from Brazil for further consideration regarding the issues raised in CAMP's appeal.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition of American Millwork Producers*

Dated: December 6, 2021

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for the Coalition of American Millwork Producers' Reply Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 6,890 words.

<u>*/s/ Timothy C. Brightbill*</u>
(Signature of Attorney)

<u>Timothy C. Brightbill</u>
(Name of Attorney)

<u>Coalition of American Millwork Producers</u>
(Representative Of)

<u>December 6, 2021</u>
(Date)