Slip Op. 22-68

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **COALITION OF AMERICAN MILLWORK PRODUCERS,** | |
| **Plaintiff,** | |
| v. | |
| **UNITED STATES,** | Before: Jennifer Choe-Groves, Judge |
| **Defendant,** | Court No. 21-00047 |
| and | |
| **ARAUPEL S.A.,** | |
| **Defendant-Intervenor.** | |

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's final negative determination in the 2019 antidumping investigation of wood mouldings and millwork products from Brazil.]

Dated:  June 15, 2022

<u>Timothy C. Brightbill</u>, <u>Laura El-Sabaawi</u>, <u>Elizabeth S. Lee</u>, and <u>Theodore P. Brackemyre</u>, Wiley Rein LLP, of Washington, D.C., for Plaintiff Coalition of American Millwork Producers.

<u>Ioana Cristei</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With her on the brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Claudia Burke</u>, Assistant Director.  Of counsel

on the brief was <u>Saad Y. Chalchal</u>, Senior Attorney, Office of the Chief Counsel
for Trade Enforcement and Compliance, U.S. Department of Commerce, of
Washington, D.C.

<u>Craig A. Lewis</u>, <u>H. Deen Kaplan</u>, <u>Maria A. Arboleda</u>, and <u>Gregory M.A. Hawkins</u>,
Hogan Lovells US LLP, of Washington, D.C., for Defendant-Intervenor Araupel
S.A.

      Choe-Groves, Judge:  Plaintiff Coalition of American Millwork

Producers ("Coalition" or "CAMP") challenges the final negative

determination by the U.S. Department of Commerce ("Commerce") on its

antidumping duty petition alleging that wood mouldings and millwork

products ("WMMP") imported from Brazil were being sold in the United

States at less than fair value.  <u>See</u> <u>Wood Mouldings and Millwork Products</u>

<u>from Brazil</u> ("<u>Final Determination</u>"), 86 Fed. Reg. 70 (Dep't of Commerce Jan.

4, 2021) (final negative determination of sales at less than fair value; 2019),

ECF No. 14-1; <u>see also</u> Issues and Decision Mem. for the Final Negative

Determination in the Less-Than-Fair-Value Investigation of Wood Mouldings

and Millwork Products from Brazil (Dec. 28, 2020) ("Final IDM"), ECF No.

14-2.  Before the Court is the Coalition's Rule 56.2 Motion for Judgment on the

Agency Record.  <u>See</u> Pl.'s Rule 56.2 Mot. J. Agency R., ECF No. 19; <u>see also</u>

Mem. Supp. Pl.'s Rule 56.2 Mot. J. Agency R. ("Pl.'s Br."), ECF Nos. 20, 21; Pl.'s

Reply Br. ("Pl.'s Reply"), ECF Nos. 34, 35.  Defendant United States

("Defendant") and Defendant-Intervenor Araupel S.A. ("Araupel") oppose the

Coalition's Rule 56.2 Motion for Judgment on the Agency Record.  See Def.'s

Opp'n Pl.'s Rule 56.2 Mot. J. Agency R. ("Def.'s Resp."), ECF Nos. 28, 29; Def.-

Interv. Araupel's Mem. Opp'n Pl.'s Rule 56.2 Mot. J. Agency R. ("Araupel's

Resp."), ECF Nos. 26, 27.  For the following reasons, the Court sustains the <u>Final</u>

<u>Determination</u>.

## ISSUES PRESENTED

The Court reviews the following issues:

1. Whether Commerce's decision to collapse Araupel and Braslumber Industria de Molduras Ltda./BrasPine Madeiras Ltda. into a single entity is supported by substantial evidence;

2. Whether Commerce's decision not to apply the major input rule to certain log purchases is supported by substantial evidence;

3. Whether Commerce's decision to revise Araupel's reported general and administrative expenses to account for fair value adjustments associated with the annual revaluation of standing trees in Araupel's unharvested forests is in accordance with the law and supported by substantial evidence; and

4. Whether Commerce's application of the Federal Reserve Bank of New York's short-term interest rate to calculate imputed credit expenses and inventory carrying costs is in accordance with the law.

## BACKGROUND

An antidumping duty investigation requires Commerce to determine whether imports of the subject merchandise are, or are likely to be, sold in the United States at less than fair value.  See 19 U.S.C. § 1673d(a)(1).[1]  Commerce makes the less-than-fair-value determination by comparing the U.S. price of the subject merchandise, typically the export price, with its normal value counterpart in the foreign market.  See id. §§ 1677a(a)–(b), 1677b(a)(1).  The margin of dumping, if any, is the amount by which the normal value exceeds the U.S. price.  See id. § 1677(35)(A).

In January 2020, Commerce initiated a less-than-fair-value investigation into WMMP from Brazil for the period covering January 1, 2019 through December 31, 2019.  Wood Mouldings and Millwork Products from Brazil and the People's Republic of China, 85 Fed. Reg. 6502, 6502–03 (Dep't of Commerce Feb. 5, 2020) (initiation of less-than-fair-value investigations), PR 46.[2]  Commerce selected Araupel, Braslumber Industria de Molduras Ltda. ("Braslumber"), and BrasPine Madeiras Ltda. ("BrasPine"), the three entities with the largest volume of subject merchandise entries into the United States

---

[1] All statutory citations are to the 2018 edition of the United States Code and all citations to regulations are to the 2020 edition of the Code of Federal Regulations.
[2] Citations to the administrative record reflect the public record ("PR") document numbers.

during the period of investigation, as the mandatory respondents.  WMMP from

Brazil: Respondent Selection Mem. (Feb. 25, 2020) at 6, PR 73.

Commerce considered comments from interested parties, including

comments submitted jointly by Braslumber and BrasPine stating that both

companies operate their own production facilities, but they would likely be

considered affiliated based on common ownership and collapsed under

administrative practice due to extensive overlap of management and sales

operations.  Id. at 5; see also 19 U.S.C. § 1677(33) (definition of "affiliated");

19 C.F.R. § 351.401(f) (collapsing regulation).  Under Commerce's collapsing

practice, when certain conditions are met, affiliated companies are collapsed (i.e.,

treated as a single entity), and assigned a single weighted-average dumping

margin.  See Koenig & Bauer-Albert AG v. United States, 24 CIT 157, 158, 90 F.

Supp. 2d 1284, 1286 (2000) (citations omitted); see also Carpenter Tech. Corp. v.

United States, 510 F.3d 1370, 1373 (Fed. Cir. 2007).

Between April 2020 and July 2020, the three mandatory respondents

submitted responses to the antidumping duty questionnaires[3] and to the

---

[3] E.g., Araupel's Section A Questionnaire Resp. (Apr. 8, 2020), PR 161–63;
Braslumber/BrasPine's Section A Questionnaire Resp. (Apr. 8, 2020), PR 164–67;
Araupel's Sections B and C Questionnaire Resp. (May 6, 2020), PR 192;
Braslumber/BrasPine's Sections C and D Questionnaire Resp. (May 6, 2020), PR
195; Araupel's Section D Questionnaire Resp. (May 14, 2020), PR 201.

supplemental questionnaires.[4]  Decision Mem. for Prelim. Negative

Determination in the Less-Than-Fair-Value Investigation of Wood Mouldings

and Millwork Products from Brazil (Aug. 5, 2020) ("Prelim. DM") at 3, PR

313.  The Coalition, Araupel, Braslumber, and BrasPine submitted pre-preliminary

determination comments to Commerce.  See CAMP's Pre-Preliminary

Determination Comments (July 15, 2020), PR 298; Araupel's Pre-Preliminary

Determination Comments (July 20, 2020), PR 309; Braslumber/BrasPine's Pre-

Preliminary Determination Comments (July 21, 2020), PR 310.  Commerce

published its preliminary determination on August 12, 2020.  Wood Mouldings

and Millwork Products from Brazil ("Prelim. Determination"), 85 Fed. Reg.

48,667 (Dep't of Commerce Aug. 12, 2020), PR 325.  As part of its

preliminary consideration, Commerce collapsed all three mandatory

respondents and considered them as a single entity.  See Prelim. Affiliation &

Collapsing Determination Mem. (Aug. 5, 2020), PR 314.

---

[4] E.g., Araupel's Suppl. Section D Questionnaire Resp. (Mar. 31, 2020), PR 146;
Araupel's Suppl. Section A Questionnaire Resp. (May 22, 2020), PR 209;
Braslumber/BrasPine's Suppl. Section A Questionnaire Resp. (June 5, 2020), PR
240–41; Araupel's Suppl. Section D Questionnaire Resp.: Questions 1 Through 25
and 31 Through 43 (July 1, 2020), PR 274–75; Araupel's Second Suppl. Section A
Questionnaire Resp. (July 6, 2020), PR 279; Araupel's Suppl. Sections A and C
Questionnaire Resp. (July 6, 2020), PR 280–84; Araupel's Third Suppl. Section A
Questionnaire Resp. (July 16, 2020), PR 300; Braslumber/BrasPine's Second
Suppl. Section A Questionnaire Resp. (July 16, 2020), PR 305.

In reaching its preliminary collapsing determination, Commerce determined that Braslumber, BrasPine, Araupel, and a certain company ("Company X") holding a controlling stake in Araupel were all under one family's common control and thus were affiliated as a matter of law.  Prelim. DM at 5; Prelim. Affiliation & Collapsing Determination Mem. at 5–6; see 19 U.S.C. § 1677(33)(A).  Based on its analysis of the regulatory criteria for collapsing producers under 19 C.F.R. § 351.401(f) and the "totality of the circumstances," Commerce collapsed Araupel, Braslumber, and BrasPine and treated them as a single entity.  Prelim. DM at 5; Prelim. Affiliation & Collapsing Determination Mem. at 6–11.  Commerce calculated preliminary antidumping duty rates of zero percent for the collapsed mandatory respondents, resulting in a negative preliminary determination.  See Prelim. Determination, 85 Fed. Reg. at 48,667.

For purposes of the preliminary dumping calculations, Commerce based normal value on "constructed value"[5] because the collapsed entity did not have viable sales of the foreign like product in Brazil or in a third-country market.

---

[5] Constructed value is "the sum of the costs of materials and fabrications or other processing of any kind employed to produce the merchandise, plus an amount for selling expenses, [general and administrative] expenses, and for profits, plus the cost of packing and shipping to the United States."  Husteel Co. v. United States, 44 CIT __, __, 471 F. Supp. 3d 1349, 1362 (2020) (citing 19 U.S.C. § 1677b(e)).

Prelim. DM at 12.  In calculating constructed value, Commerce relied on the

cost data reported by each of the mandatory respondents, with a few

exceptions.  Id. at 12–13.  One exception involved certain annual revaluations

of Araupel's biological assets, i.e., its unharvested forests and the logs

harvested from its forests.  Cost of Production & Constructed Value

Calculation Adjustments for the Prelim. Determination Mem. (Aug. 5, 2020)

("Prelim. Cost Mem.") at 1–2, PR 322–23.  These annual revaluations were not

included in Araupel's costs reported to Commerce but were present in its

books and records kept in the normal course of business.  Id.  Araupel's

audited financial statements recognized the fair value adjustments for

biological assets in accordance with Brazilian Generally Accepted Accounting

Principles ("GAAP").  Id.  Commerce adjusted Araupel's reported total cost of

manufacturing preliminarily as well as Araupel's reported general and

administrative ("G&A") expenses to account for the fair value adjustment

related to harvested logs.  Id.

Due to the COVID-19 pandemic, Commerce was unable to conduct on-

site verification and instead issued verification questionnaires to Araupel and

to Braslumber/BrasPine.  See, e.g., Letter to Braslumber/BrasPine in Lieu of On-

Site Verification (Oct. 14, 2020), PR 361.  After the verification questionnaires

and the preliminary determination were issued, interested parties submitted

case and rebuttal briefs on the preliminary determination.  Final IDM at 2–3;

see, e.g., Braslumber/BrasPine's Case Br. (Nov. 13, 2020), PR 384; CAMP's

Case Br. (Nov. 13, 2020), PR 385–86; Araupel's Rebuttal Br. (Nov. 23, 2020),

PR 389.

The Coalition argued that: (1) Commerce should not collapse Araupel with

Braslumber and BrasPine; (2) Commerce should apply the major input rule under

19 U.S.C. § 1677b(f)(3) to certain log purchases by Araupel because it is affiliated

with its log supplier and logs are critical in the production of WMMP; (3)

Commerce should use Araupel's reported G&A expenses and not decrease them by

the annual fair value adjustment of Araupel's unharvested forests; and (4) in order

to impute Araupel's credit expenses, Commerce should use the U.S. dollar short-

term interest rate from the Federal Reserve's Small Business Lending Survey and

not use the short-term interest rate from the Federal Reserve Bank of New York

reported by Araupel.  CAMP's Case Br. at 4–33, 42–44, 45–47, 51–55.

In the Final Determination, Commerce: (1) determined that, despite the

absence of intertwined operations between Araupel and Braslumber/BrasPine

weighing against collapsing, Commerce continued to collapse the three

mandatory respondents because the totality of the evidence on the record

showed that the regulatory criteria under 19 C.F.R. § 351.401(f) had been

satisfied, in particular that other evidence established a significant potential for

the manipulation of price or production among the entities, see Final IDM at 4–

17; (2) did not apply the major input rule to Araupel's log purchases from its

supplier because it determined that Araupel and its supplier were not affiliated,

see id. at 38–41; (3) continued to adjust Araupel's reported G&A expenses to

account for the annual fair value adjustments pertaining to Araupel's

unharvested forests, see id. at 36–38; and (4) continued to impute Araupel's

credit expenses applying the short-term interest rate from the Federal Reserve

Bank of New York, see id. at 48–51.  Commerce calculated a final estimated

weighted-average dumping margin of zero percent for the collapsed entity, see

Final Determination, 86 Fed. Reg. at 70, and because Commerce reached a

negative determination, the investigation terminated pursuant to 19 U.S.C. §

1673d(c)(2) and did not result in the issuance of an antidumping duty order,

see id. at 71.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(ii) and 28

U.S.C. § 1581(c), which grant the Court authority to review actions contesting a

final negative determination in an antidumping duty investigation.  The Court will

hold unlawful any determination found to be unsupported by substantial evidence

on the record or otherwise not in accordance with the law.  19 U.S.C. §

1516a(b)(l)(B)(i).

## DISCUSSION

### I.      Determination to Collapse Araupel with Braslumber/BrasPine

When appropriate, Commerce collapses related entities and treats them as

one entity, resulting in the calculation of a single weighted-average dumping

margin for the collapsed entity as a whole.  See, e.g., Carpenter Tech. Corp., 510

F.3d at 1373; Koenig & Bauer-Albert AG, 24 CIT at 158–59, 90 F. Supp. 2d at

1286.  The collapsing practice is meant to ensure that Commerce reviews the entire

producer or reseller, not merely part of it, Queen's Flowers de Colombia v. United

States, 21 CIT 968, 971, 981 F. Supp. 617, 622 (1997), and prevents affiliated

entities from circumventing antidumping duties by channeling production of

subject merchandise through the affiliate with the lowest potential dumping

margin, Slater Steels Corp. v. United States, 27 CIT 1255, 1261, 279 F. Supp. 2d

1370, 1376 (2003).

The authority to collapse arises out of Commerce's "responsibility to

prevent circumvention of the antidumping law."  Prosperity Tieh Enter. Co. v.

United States, 965 F.3d 1320, 1323 (Fed. Cir. 2020) (quoting Queen's Flowers, 21

CIT at 971, 981 F. Supp. at 622).  The decision whether to collapse entities is a

fact-specific inquiry and therefore a case-by-case determination.  See Antidumping

Duties; Countervailing Duties ("Preamble"), 62 Fed. Reg. 27,296, 27,345–46

(Dep't of Commerce May 19, 1997).  By regulation, there are three preconditions

for collapsing: (1) entities must be "affiliated;" (2) they must have "production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities;" and (3) there must exist "a significant potential for the manipulation of price or production."  19 C.F.R. § 351.401(f)(l).

"Affiliated persons" and "affiliated parties" in the regulation have the same meanings as the statutory definition, which includes members of a family (siblings, spouses, ancestors, lineal descendants); any officer or director of an organization (and such organization); partners; employer-and-employee; and any person directly or indirectly owning, controlling, or holding with power to vote five percent or more of the outstanding voting stock or shares of any organization (and such organization).  19 U.S.C. § 1677(33).  Also included is any controlling or controlled person, and "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."  Id.

Commerce also defines by regulation any "person" to include "any interested party as well as any other individual, enterprise, or entity, as appropriate," 19 C.F.R. § 35l.102(b)(37), and the agency's interpretation of "person" to encompass a "family grouping" for purposes of affiliation has been upheld.  See Echjay Forgings Priv. Ltd. v. United States, 44 CIT __, __, 475 F.

Supp. 3d 1350, 1365–67 (2020); see also Ferro Union, Inc. v. United States, 23

CIT 178, 194–95, 44 F. Supp. 2d 1310, 1326 (1999).  To determine whether

"control over another person exists" within the meaning of 19 U.S.C. § 1677(33),

> the Secretary will consider the following factors, among others:
> Corporate or family groupings; franchise or joint venture agreements;
> debt financing; and close supplier relationships.  The Secretary will not
> find that control exists on the basis of these factors unless the
> relationship has the potential to impact decisions concerning the
> production, pricing, or cost of the subject merchandise or foreign like
> product.   The Secretary will consider the temporal aspect of a
> relationship in determining whether control exists; normally, temporary
> circumstances will not suffice as evidence of control.

19 C.F.R. § 35l.102(b)(3).

Regarding the second precondition, affiliated entities must have "production

facilities for similar or identical products that would not require substantial

retooling of either facility in order to restructure manufacturing priorities."  Id. §

351.401(f)(l).  This consideration "requires similarity in the products produced, not

in the facilities that produce them."  Viraj Grp. v. United States, 476 F.3d 1349,

1356 (Fed. Cir. 2007).

The third precondition is "a significant potential for the manipulation of

price or production," and Commerce "may consider" the following: (1) the level of

common ownership; (2) the extent to which managerial employees or board

members of one firm sit on the board of directors of an affiliated firm; and

(3) whether operations are intertwined, for example through the sharing of sales

information, involvement in production and pricing decisions, the sharing of

facilities or employees, or significant transactions between the affiliated producers.

19 C.F.R. § 351.401(f)(2).  This list for the manipulation of price or production,

which is non-exhaustive, "focuses on what may transpire in the future."  Preamble,

62 Fed. Reg. at 27,346; see also Jinko Solar Co. v. United States, 41 CIT __, __,

279 F. Supp. 3d 1253, 1261 (2017) ("The emphasis in the regulation is on the

potential for, not actual, manipulation.").  Commerce need not find all of the

factors in the regulation present to find a significant potential for manipulation of

price or production, U.S. Steel Corp. v. United States, 40 CIT __, __, 179 F. Supp.

3d 1114, 1139 (2016), as the factors are considered by Commerce in light of the

totality of the circumstances and no one factor is dispositive in determining

whether to collapse the producers, Zhaoqing New Zhongya Aluminum Co. v.

United States, 39 CIT __, __, 70 F. Supp. 3d 1298, 1304 (2015).

   The Coalition challenges Commerce's determination regarding the third

"significant potential for manipulation" precondition.[6]  See CAMP's Case Br. at

---

[6] The Coalition "strongly" disagrees with Commerce's finding that Araupel is affiliated with Braslumber/BrasPine but states that in the interest of limiting the issues here, it has not appealed this issue and assumes for the sake of argument that the affiliation requirement is satisfied.  CAMP's Case Br. at 21.  The Coalition also does not contest Commerce's finding that the "substantial retooling" requirement was met, but disagrees that this is meaningful because the companies at issue are both mandatory respondents and it is essentially a

21–22.  The Coalition argues that Commerce unreasonably collapsed Araupel with

Braslumber/BrasPine because the only "shared" commonality between them is the

ancestry of the lineal descendants of a certain ancestor among individuals in

"decision making" positions at each company, and Araupel and

Braslumber/BrasPine had provided voluminous evidence to demonstrate that they

are competitive, independent of each other, and have had no commercial

interaction except for one small-volume transaction in 2019.  See generally Pl.'s

Br. at 3–11, 20–30; Pl.'s Reply at 2–10.  The Coalition argues that the collapsing

regulation above all requires a "significant" potential for price manipulation

because "any" potential for price manipulation "would lead to collapsing in almost

all circumstances in which [Commerce] finds producers to be affiliated."  Pl.'s Br.

at 19–20 (quoting Preamble, 62 Fed. Reg. at 27,345).  Such an outcome was

"neither [Commerce's] current nor intended practice," id. at 20 (quoting Preamble,

62 Fed. Reg. at 27,345), and cases have upheld this "significant" standard, see,

e.g., Carpenter Tech. Corp., 510 F.3d at 1374.  The U.S. Court of Appeals for the

Federal Circuit recently reiterated the importance of this "significant" element in

Prosperity Tieh Enterprise Co. v. United States, 965 F.3d 1320, 1323 (Fed. Cir.

---

"given" that both companies would have production facilities for similar products,
i.e., the subject merchandise.  Id. at 21–22.

2020) (Commerce "emphasized that collapsing requires a 'significant' potential for

manipulation" in the Preamble), and the Coalition notes that Commerce has stated

that while it may find two companies affiliated on the basis of equity interest, when

deciding whether to collapse them, the existence of such equity interest "absent

other factors may be insufficient to warrant collapsing," summarizing that

"affiliation alone is not a sufficient basis to collapse." Certain Welded Carbon

Steel Pipes and Tubes from Thailand, 63 Fed. Reg. 55,578, 55,582 (Dep't of

Commerce Oct. 16, 1998); see also Steel Threaded Rod from India, 79 Fed. Reg.

40,714 (Dep't of Commerce July 14, 2014).

Defendant and Araupel contend that Commerce's collapsing determination

is reasonable. Def.'s Resp. at 17–21; Araupel's Resp. at 11–12. Defendant argues

that in considering whether entities are affiliated, it is Commerce's practice to

consider the ownership interest of the individual members of a family grouping in

the aggregate, and that the family aggregate in this case owns the majority of

Braslumber's and BrasPine's equity and also has indirect majority control of

Araupel through its ownership of certain holding companies, in addition to owning

direct equity in BrasPine. Def.'s Resp. at 17–21.

Defendant and Araupel argue that Commerce properly considered each of

the factors listed in the regulation for the collapsing test. Id.; Araupel's Resp. at

11–12. Commerce contends that it considered the "level of common ownership,"

19 C.F.R. § 351.401(f)(2)(i), by stating the percentages of each company's shares held by the family group and finding that "the family group's aggregate direct and indirect shareholdings demonstrate[] a significant level of common ownership between Araupel and Braslumber/BrasPine." Def.'s Resp. at 19 (quoting Final IDM at 13) (citations omitted); see Araupel's Resp. at 18–20. As to "the extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm," 19 C.F.R. § 351.401(f)(2)(ii), Commerce examined the family group's collective presence in the companies and found that "members of the family grouping hold senior management positions and board positions at Araupel and Braslumber/BrasPine." Def.'s Resp. at 19–20 (quoting Final IDM at 12) (citations omitted); see Araupel's Resp. at 20. Defendant contends that Commerce's explanation that "decision-making positions held by the family group can significantly influence and manipulate the pricing or production at Araupel and Braslumber/BrasPine" is reasonable based on evidence on the record. See Def.'s Resp. at 20 (quoting Final IDM at 13). Lastly, considering "whether operations are intertwined," 19 C.F.R. § 351.401(f)(2)(iii), Defendant and Araupel argue that Commerce acknowledged that Araupel did not appear to have intertwined operations with Braslumber and BrasPine, see Prelim. Affiliation & Collapsing Determination Mem. at 10, but contend that Commerce properly explained that no one factor alone is dispositive and that the "totality" of the evidence weighed in

favor of finding a significant potential for manipulation of price or production.  <u>See</u>
Def.'s Resp. at 20–21 (quoting Final IDM at 12, 14–16); <u>see also</u> Araupel's Resp.
at 22–24.  Defendant argues that because the analysis "focuses on what may
transpire in the future," and "Araupel and Braslumber/BrasPine have the capability
to intertwine their operations in the future" considering the family group's overall
presence, "[t]he family group's prominent role in the ownership, management, and
boards in each of the three companies enable it to coordinate its actions to direct
the companies to act in concert or out of common interest such that the family
group could direct outcomes across the companies, thereby creating a significant
potential for the manipulation of price or production."  Def.'s Resp. at 21 (citing
Final IDM at 12–13).

The Court concludes that substantial evidence supports Commerce's
determination to collapse Araupel with Braslumber/BrasPine.  Commerce
determined that evidence showed that Braslumber and BrasPine had an almost
identical ownership structure, an overlapping management structure, an
intertwined production process, and that the lineal descendants of a common
ancestor (the "family") held majority control of both Braslumber and BrasPine.
Prelim. Affiliation & Collapsing Determination Mem. at 2–3.  Record
evidence demonstrated that Braslumber and BrasPine also had similar mills
that produced almost the same products, including the subject merchandise

WMMP that undergo similar production processes.  See id.  Commerce

determined based on its review of the record evidence that Araupel, Braslumber,

and BrasPine had manufacturing facilities for similar or identical products and no

retooling would be required in order to restructure manufacturing priorities.  Id.

With respect to the issue of whether there was "significant potential

for manipulation of price or production" under 19 C.F.R. § 351.401(f)(2)(i),

Commerce reviewed evidence relating to the level of common ownership,

shared management or board membership, and intertwined operations,

which 19 C.F.R. § 351.401(f)(2) sets forth as factors for consideration.  See id.

at 6–11.  Commerce determined based on a review of record evidence that

Braslumber and BrasPine were majority owned by the same family group,

had the same board of directors, board and decision-making managerial

positions held by family members, and had overlapping management and

sales operations.  Id.  The two companies also frequently purchased semi-

finished products from each other.  Id. at 10.

As for Araupel, Commerce determined based on evidence on the record

that because Company X held a controlling stake in Araupel and because

family members owned most of the shares of Company X, the family therefore

indirectly held a majority of the equity in Araupel.  See id. at 3, 5, 9 (citing

Araupel's responses to supplemental questionnaires).  Commerce also determined

that some family members on the boards of Braslumber and/or BrasPine held

shares in Company X as well as Braslumber and/or BrasPine.  Id. at 2–3 (citing

responses to supplemental questionnaires).  Certain family members held

decision-making positions at Company X, and other family members at

Araupel.  See id. at 3 (citing responses to supplemental questionnaires).

Commerce determined that Araupel also had mills that produced WMMP but

maintained that its operations were independent from Braslumber and

BrasPine, with one small-volume transaction during the period of investigation

of a certain processed product between Araupel and Braslumber and/or

BrasPine.  Id. at 8 (citing responses to supplemental questionnaires); see

generally Final IDM at 9–17.

It may be true, as the Coalition argues, that in prior cases of collapsing there

have been more prominent indicia of "shared" activity between the collapsed

entities to justify their collapse than are present in this instance.  See, e.g., Jinko

Solar Co., 41 CIT at __, 279 F. Supp. 3d at 1261 (family grouping played a

prominent role in the management of both entities concerned in addition to

other evidence including substantial transactions between the two entities);

U.S. Steel Corp., 40 CIT at __, 179 F. Supp. 3d at 1139 (Commerce concluding

that the family grouping's control in that case was "more active than that of

other shareholders").  In this instance, based on a review of evidence on the

record, the Court concludes that it was reasonable for Commerce to determine that

a significant potential for the manipulation of price or production was posed by the

family grouping's indirect majority control of all three companies when coupled

with the presence of family individuals in decision making positions at each

company during the period of investigation, regardless of the fact that the three

respondent companies' operations were not actively "intertwined" during the

period of investigation.  The relevant metric in cases involving multiple members

of the same family is the degree of aggregate involvement by the family group, not

that of any single member of the family group.  See, e.g., Zhongya, 39 CIT at __,

70 F. Supp. 3d at 1305.  Commerce need not find all of the factors in the regulation

present to find a significant potential for manipulation of price or production.  U.S.

Steel Corp., 40 CIT at __, 179 F. Supp. 3d at 1139.

The Court concludes that Commerce reasonably supported its collapsing

determination based on substantial evidence on the record.  For the above reasons,

the Court sustains Commerce's determination to collapse Araupel with Braslumber

and BrasPine.

## II.   Decision to Find Araupel Not Affiliated with "Company A" For the Purpose of the Major Input Rule

One component in the calculation of constructed value is "the cost of

materials and fabrication or other processing of any kind employed in

producing the merchandise." 19 U.S.C. § 1677b(e)(1).  Such costs may

include inputs (either self-produced or purchased from third parties) that are

consumed in the production of subject merchandise.  The statute provides

special rules relating to the treatment of transactions between affiliated parties

in the calculation of constructed value.  See id. § 1677b(f)(2)–(3).  Under 19

U.S.C. § 1677b(f)(3), commonly referred to as the "major input rule,"

Commerce evaluates whether the sale of a major input between affiliated

parties is made at arm's length.  Huvis Corp. v. United States, 32 CIT 845, 846

(2008).  To be clear, the major input rule only applies in an instance of affiliation.

See Statement of Administrative Action Accompanying the Uruguay Round

Agreements Act, H.R. Doc. No. 103-316, at 838 (1994), reprinted in 1994

U.S.C.C.A.N. 4040, 4175 ("SAA"); 19 C.F.R. § 351.407(b).

When the major input rule is applicable, Commerce compares the input's

transfer prices and its market price to the affiliated suppliers' costs of

production and values the major input based on the highest of transfer price,

market value, or the affiliated supplier's cost of production.  19 U.S.C.

§ 1677b(f)(3); see 19 C.F.R. § 351.407(b); see also NTN Bearing Corp. v.

United States, 368 F.3d 1369, 1374–75 (Fed. Cir. 2004).  An input is

considered "major" based on the significance of the value of the purchases

from an affiliate in relation to the total cost of manufacturing all products

under investigation.  19 C.F.R. § 351.407(b)(2).  Because the statute does not

define what constitutes a "major input," the Court defers to Commerce's

interpretation if it is reasonable.  See Mitsubishi Heavy Indus., Ltd. v. United

States, 22 CIT 541, 569, 15 F. Supp. 2d 807, 830 (1998).

The Coalition challenges Commerce's determination that Araupel was not

affiliated with its standing log supplier and argues that Commerce should have

applied the major input rule.  Pl.'s Br. at 32.  Araupel reported that logs are the

most significant input to Araupel in the production of wood mouldings.  Araupel's

Suppl. Section D Questionnaire Resp.: Questions 1 Through 25 and 31 Through 43

(July 1, 2020) ("Araupel SDQR Questions") at SD-4, CR 194–205, PR 274–75.

During the period of investigation, Araupel bought standing logs from "Company

A,"[7] a wholly owned subsidiary of Company B,  on land owned by Company C

and Company D.  Araupel's Section D Initial Questionnaire Resp. (May 14, 2020)

("Araupel DQR") at D-10 & n.5, PR 201; Araupel's Section A Questionnaire

---

[7] Commerce used these letters to refer to business proprietary company names:
Company A refers to the company that harvested and supplied logs to Araupel;
Company B refers to the parent company of Company A and joint venture partner
with Araupel; and Company C and Company D refer to the two companies that
held partial ownership of the land on which Company A harvested the logs
purchased by Araupel.  Company E refers to the entity originally designated to
hold title to the biological assets, which prior to the period of investigation merged
with Company A.  See Final IDM at 38–41; Business Proprietary Information
Mem., CR 341 (Dec. 28, 2020).

Resp. (Apr. 8, 2020) ("Araupel AQR") at A-11 n.5, PR 161–63.  Because Araupel

maintained a joint venture partnership with Company B during the period of

investigation, the Coalition contends that Araupel and Company B "jointly owned"

Company C and Company D.  See Araupel AQR at A-11 n.4; Araupel DQR at D-

11 & n.6; Araupel SDQR Questions at SD-6.

> The joint venture was intended to allow [Company B's parent] to invest
> in standing timber in Brazil and to reduce the risk of its investment
> because Araupel would purchase the timber for its operations; and
> Araupel would have a reliable source of timber supply in the region
> close to its plants.  This would bring together [the parent's] expertise
> on forestry management and Araupel's operational management and
> knowledge of the region.

Araupel's Second Suppl. Section A Questionnaire Resp. (July 6, 2020) ("Araupel

SSAQR") at S2A-2, PR 279.

The Coalition argued to Commerce that Araupel should be considered

affiliated with its standing log supplier, Company A, and that it should apply the

major input rule to the standing logs that Company A supplied to Araupel in the

production of WMMP.  See CAMP's Case Br. at 42–44.  Araupel filed a rebuttal

brief, arguing that the major input rule does not apply to logs that Araupel

purchased from Company A.  See Araupel's Rebuttal Br. at 37–43.  In its Final

Determination, Commerce determined that the record indicated that:

> Araupel and Company B entered into a joint venture agreement prior to
> the [period of investigation] to invest in rural land for timber
> production.[]   The joint venture agreement allowed Company B's

foreign-owned parent company to maintain investments in timber in Brazil.[] Araupel and Company B held shares in Company E, the entity originally designated to hold title to the biological assets, which prior to the [period of investigation] merged with Company A.[]  At that point, Araupel transferred any remaining shares it owned of Company E to Company A.[]  Company A is wholly-owned by Company B.[] Under the joint venture agreement, Araupel was a minority shareholder in Companies C and D, while Company B held the remaining ownership shares.[]  Companies C and D hold title to the land in which Company A harvests the logs that Araupel purchases for the production of subject merchandise.[]  Araupel explained that, in Brazil, different entities can hold titles to the land and the biological assets held on that land.[]  Araupel also stated that it did not share any board members, company directors, or employees with Companies A or B, nor did it exercise any control over the operations, production or pricing decisions of Companies A or B.[]

. . .  Under 19 [C.F.R. §] 351.102(b)(3), Commerce determines whether control over another person exists, within the meaning of section 771(33) of the Act, by considering certain relationships, including joint venture agreements.  However, Commerce will not find that control exists in these relationships unless the relationship has the potential to impact decisions concerning production, pricing, or cost of the subject merchandise or foreign like product.  In this case, we find that Araupel has sufficiently demonstrated that it does not have ownership over Companies A and B, nor that the joint venture has the potential to impact decisions concerning the production, pricing, or cost of subject merchandise.   Therefore, in accordance with 19 [C.F.R. §] 351.102(b)(3) and consistent with Commerce's practice, we find that neither affiliation nor control exists between Araupel and Companies A and B on the basis of the joint venture.[]  As such, we have not applied the major input rule to Araupel's log purchases from Company A for this final determination.

Final IDM at 40–41 (footnotes omitted).

The Coalition contends that Commerce's determination that Araupel was not

affiliated with its log supplier, Company A, despite its joint venture with the

supplier's parent company, Company B, is flawed.  See Pl.'s Br. at 32–37.  The

Coalition argues that the elements for finding affiliation are satisfied here because

Araupel is legally and operationally in a position to exercise restraint and

discretion over the production and sales of logs by Company A.  See id. at 34.  The

Coalition argues that Araupel maintains control over Company A through its joint

venture partnership with Company B, which wholly owns Company A, and that

control can also be discerned through Araupel's close supplier relationship with

Company A.  Id. (citing Araupel AQR at A-11 n.4).

As to the first point, the Coalition asserts that Araupel's joint venture

arrangement is focused entirely on Company A's production and supply of logs

through the ownership of land held by Company C and Company D, and as a

result, Araupel's joint venture partner, Company B, is legally positioned to

exercise control over Company A as its parent company.  Id. (citing Araupel DQR

at D-10).  According to the Coalition, Araupel is positioned jointly to exercise

operational control over Company A, particularly since the Coalition contends that

the record shows a symbiotic relationship between Araupel and Company A.  Id.

(citing Araupel's Suppl. Section A Questionnaire Resp. (May 22, 2020) ("Araupel

SAQR") at SA-4–SA-5, Ex. SA-2, PR 209).  The Coalition contends that the whole

purpose of the joint venture between Araupel and Company B was to own the land

for harvesting the logs that Company A then sold to Araupel, so Araupel was

necessarily positioned to exercise restraint and discretion over the production and

sales of logs by Company A.  See id. (citing Araupel SSAQR at S2A-2).

        As to the second point, the Coalition contends that because log purchases are

a key input for Araupel in manufacturing subject merchandise, the relationship

between Araupel, Company A, Company B, and the joint venture partnership

companies (Company C and Company D) had an "obvious" potential to impact

decisions concerning the production, pricing, or cost of the subject merchandise

during period of investigation.  Id. at 35 (citing Araupel SDQR Questions at SD-4).

The Coalition asserts that any decisions concerning the supply of logs significantly

and directly impact the production and sale of subject WMMP.  Id.  The Coalition

contends that Araupel purchased standing logs only from Company A during the

period of investigation and that Company A does not appear to have had other

operations.  Id. at 36 (citing Araupel SAQR at SA-5, Ex. SA-2).  With such a

relationship, both companies maintained the ability to impact the other's

production, pricing, and cost decisions, according to the Coalition.  Id.

        The Coalition highlights that the U.S. Court of International Trade has

previously found the exclusivity of a supplier to a customer to be indicative of

whether a close customer-supplier relationship exists.  In Itochu Building Products,

Co. v. United States, 41 CIT __, __, 163 F. Supp. 3d 1330, 1338–39 (2016), the

court concluded that Commerce failed to adequately explain its affiliation

determination related to a joint partnership.  In its remand redetermination,

Commerce continued to find affiliation by pointing to such facts as one partner

being by far the largest customer of the other.  Similarly, in <u>Mitsubishi Heavy</u>

<u>Industries, Ltd. v. United States</u>, 23 CIT 326, 334, 54 F. Supp. 2d 1183, 1191

(1999), Commerce found that because a company made greater than fifty percent

of its sales to another company, there was a reasonable indication of a close

supplier relationship.  The Coalition argues that, compared to <u>Itochu Building</u>

<u>Products, Co.</u> and <u>Mitsubishi Heavy Industries, Ltd.</u>, the facts of this case weigh

more strongly in favor of finding affiliation between Araupel and Company A.

<u>See</u> Pl.'s Br. at 35–37.  The Coalition contends that Company A is not merely

Araupel's largest log supplier, it is its only supplier, which is indicative of a close

supplier relationship implicating control issues regarding the pricing, production,

and cost decisions of the other company.  <u>See</u> <u>id.</u> at 35–36.  Additionally, the

Coalition asserts that under agency practice, Commerce does not need to determine

that Araupel and Company A actually exercised control over each other or actually

impacted each other's production, pricing, or cost decisions during the period of

investigation; Commerce need only find that these companies had the potential of

control.  <u>See</u> <u>id.</u> at 36.

    Defendant and Araupel argue that the Coalition's view of the case is

inaccurate.  Defendant and Araupel contend that record evidence demonstrates that

"the joint venture agreement [between Araupel and Company B] allowed Company B's foreign-owned parent company to maintain investments in timber in Brazil." Def.'s Resp. at 32 (quoting Final IDM at 40); see Araupel's Resp. at 27–29. Defendant notes that record evidence shows that Company C and Company D "hold title to the land in which Company A harvests the logs that Araupel purchases for the production of subject merchandise" under the joint venture agreement. Def.'s Resp. at 32 (quoting Final IDM at 40). Defendant argues that record evidence supports Commerce's determination that during the period of investigation, Araupel did not have any ownership interest in Company A or Company B, nor did Company A or Company B have any ownership interest in Araupel, and Araupel held only a minority interest in Company C and Company D. See id. at 32–33 (citing Araupel AQR at Ex. 4; Araupel SAQR at SA-4). Defendant asserts that there is no evidence that Araupel shared any board members, company directors, or employees with Company A or Company B, or exercised any control over the operations, production, or pricing decisions of Company A or Company B. Id. In addition, Defendant contends that the record shows that Araupel sourced "logs" (not just standing logs) from multiple sources (including its own production of logs) and that the logs supplied by Company A did not represent most of the total volume of logs that Araupel used to produce subject merchandise during the period of investigation. Id. at 33.

To support its determination that the joint venture agreement under which

Araupel acquired logs from Company A did not show that affiliation or control

existed between Araupel, Company A, and Company B, Commerce cited

Corrosion-Resistant Steel Products From the Republic of Korea, 84 Fed. Reg.

48,118 (Dep't of Commerce Sept. 12, 2019) (preliminary results), unchanged in

Corrosion-Resistant Steel Products From the Republic of Korea ("CORE from

Korea"), 85 Fed. Reg. 15,114 (Dep't of Commerce Mar. 17, 2020) (final results),

in which Commerce made an administrative decision of no affiliation between

companies that had entered into a joint venture agreement and had a similar buyer-

supplier relationship.  See Final IDM at 41 n.216.  Defendant argues that CORE

from Korea supports Commerce's determination of no close supplier relationship

on the facts of the WMMP investigation because Araupel and Company A do not

have an exclusive supply agreement such that Araupel would not be free to

purchase logs from, or Company A would not be free to sell logs to, third parties.

Def.'s Resp. at 34 (citing Prelim. DM at 12).  Defendant also contends that "the

record shows that Araupel had multiple sources for its log supply."  Id.

As discussed previously, affiliation can imply a certain amount of control

between affiliates, which the statute defines as "legally or operationally in a

position to exercise restraint or direction over the other person."  19 U.S.C.

§ 1677(33).  Commerce's regulations specify that control occurs when "the

relationship has the potential to impact decisions concerning the production,

pricing, or cost of the subject merchandise or foreign like product."  19 C.F.R.

§ 351.102(b)(3).  Among the types of arrangements that Commerce considers in

making its determination are joint ventures or close supplier relationships in which

the supplier or buyer becomes reliant upon the other.  See SAA at 838; 19 C.F.R.

§ 351.102(b)(3).  When analyzing whether a joint venture has control with respect

to a third party, two elements must be met for affiliation to exist: (1) two parties

must be legally or operationally in a position to exercise restraint or direction over

the third party, and (2) the relationship must have the potential to impact decisions

concerning the production, pricing, or cost of the subject merchandise.  E.g.,

Itochu Bldg. Prods., Co., 41 CIT at __, 163 F. Supp. 3d at 1336–37.

   In reply to Defendant's contention that the Coalition "has not identified any

record evidence to show that Company A exclusively sold its logs to Araupel

during the [period of investigation]," Def.'s Resp. at 34, the Coalition argues that

Araupel stated in its supplemental Section A questionnaire response that it

"harvested logs for use in the production of WMMP that were owned by

[Company A] on land owned by [Company C and Company D], and other

Brazilian entities.  Araupel is not aware of any other operations by [Company A],"

Pl.'s Reply at 17 (citing Araupel SAQR at SA-4–SA-5).  "[G]iven that Araupel and

Company B have a [joint venture] established in order to permit Company A to

supply logs, this statement reasonably serves as evidence that Company A

exclusively sold its logs to its parent company's [joint venture] partner—Araupel."

Id.

The Court agrees with Defendant and Araupel that Commerce's

determination to treat Araupel and Company A as unaffiliated was reasonable and

supported by substantial evidence.  As Defendant and Araupel point out, evidence

on the record supports Commerce's determination that Araupel was not Company

A's only customer.  See, e.g., Araupel Resp. at 31 & n.2 (citation omitted).

Similarly, Araupel did not source logs only from Company A.  See, e.g., id. at 31

(citation omitted).  For example, evidence on the record established that, while

Araupel was a joint venture partner with Company A, it was otherwise unaffiliated

with Company A.  Araupel AQR at A-11 n.4; Araupel SDQR Questions at SD-5

n.2, SD-12; Araupel SSAQR at S2A-4.  Araupel does not participate in Company

A's negotiations with landowners in regard to potential lease payments.  Araupel

SDQR Questions at SD-6.  Araupel does not hold any investments in Company B

or any of its affiliated companies, and neither Company B nor any of its affiliated

companies hold any ownership interest in Araupel, either directly or indirectly.

Araupel SSAQR at S2A-3.  Araupel did not exercise any control over the

operations, production, or pricing decisions of Company A or Company B during

the joint venture.  Id.  Araupel does not share any board members or company

directors/employees with Company A or Company B.  Id.  Because substantial

evidence on the record supports Commerce's determination that Araupel was not

affiliated with Company A, the Court sustains Commerce's determination not to

apply the major input rule.

### III.    Decision to Revise Araupel's Reported G&A Expenses

In matters of costs of production and constructed value, 19 U.S.C.

§ 1677b(f)(l)(A) provides that "[c]osts shall normally be calculated based on the

records of the exporter or producer of the merchandise, if such records are kept in

accordance with the generally accepted accounting principles of the exporting

country (or the producing country, where appropriate) and reasonably reflect the

costs associated with the production and sale of the merchandise."  19 U.S.C.

§ 1677b(f)(l)(A).  Administrative deviation from the company's normal books and

records is authorized if any of those conditions are not met, if Commerce

"consider[s] all available evidence on the proper allocation of costs[.]"  Id.; see

SAA at 834; see, e.g., Dillinger France S.A. v. United States, 981 F.3d 1318,

1321–24 (Fed. Cir. 2020).  "Costs shall be allocated using a method that

reasonably reflects and accurately captures all of the actual costs incurred in

producing and selling the product under investigation or review."  SAA at 835.

Also, Commerce "will consider whether the producer historically used its

submitted cost allocation methods to compute the cost of the subject merchandise

prior to the investigation or review and in the normal course of its business

operation." Id.

In calculating costs as part of constructed value, "Commerce must include

selling, general, and administrative expenses." Mid Continent Steel & Wire, Inc.

v. United States, 41 CIT __, __, 273 F. Supp. 3d 1161, 1166 (2017) (citing 19

U.S.C. § 1677b(e)(2)(A)–(B)). G&A expenses are not defined in the statute, but

"are generally understood to mean expenses which relate to the activities of the

company as a whole rather than to the production process." Id. (internal quotations

and citation omitted). "[T]he numerator of the G&A expense ratio is the

respondent's expenses attributable to general operations of the company and the

denominator is the respondent's company-wide [cost of goods sold]." Id.

Commerce is afforded "significant deference" in the calculation of G&A expenses

because "it is a determination 'involv[ing] complex economic and accounting

decisions of a technical nature.'" Id. (quoting Fujitsu Gen. Ltd. v. United States,

88 F.3d 1034, 1039 (Fed. Cir. 1996)).

Araupel reported that the value of its "biological assets" (forests) is carried

at fair value less estimated selling costs at the time of harvest. Araupel's Resp. at

8. Araupel added a field to its cost database, WOODFV, to report the fair value

adjustment for wood assigned in its system and it reported that this adjustment is

applicable to self-grown and harvested wood but is not part of its cost of

manufacturing or cost of production for the "merchandise under consideration."
Araupel DQR at D-48.  Commerce asked Araupel to describe how and when the
fair values of wood are determined in its normal books and records.  Araupel
explained that when goods are sold, adjustments are recorded in a particular
International Financial Reporting Standards account (i.e., "wood," a/k/a
"madeira"), that they are part of the inventoried cost of the finished goods, and that
the amounts are ultimately recorded in Araupel's earnings statement.  Araupel
SDQR Questions at SD-25–SD-26.  Araupel explained that the wood fair value
adjustments do not correspond with log inventory adjustments but are considered
part of the inventoried cost of the finished goods, and that excluding the "fair value
of wood" cost from the total cost of manufacturing and determining its raw
materials costs on a historical cost basis would be consistent with Commerce's
normal practice of considering historical costs in its cost calculations.  Id. at SD-
26.  When asked by Commerce to either revise its G&A expenses to include the
fair value "variation" of its biological assets or explain why not, Araupel stated
that it did not believe that it was appropriate to include this item in G&A expenses
and that Araupel's self-grown logs should be valued at historical cost.  Id.

Commerce preliminarily adjusted Araupel's reported costs to include the fair
value adjustments.  See Prelim. Cost Mem. at 1–2.  In addition to adding the
product-specific fair value adjustments for harvested logs that Araupel submitted

under the WOODFV field to the total cost of manufacturing field, Commerce

revised Araupel's reported G&A expenses to include a fair value adjustment for

unharvested forests for fiscal year 2019, in effect adding a biological assets gain

from a particular account.  See id. at 2, Attach. 1.  Commerce reasoned that

"[b]ecause Araupel recognizes the fair value adjustments in its normal books and

records, we revised the company's reported costs to include both fair value

adjustments (the unharvested forest and the harvested log) in [cost of production]."

Id. at 2.

In response, the Coalition argued in its case brief that Commerce should

have used the G&A expenses reported by Araupel without an adjustment to

include the fair value adjustment for unharvested forests.  See CAMP's Case Br. at

45–47.  Araupel defended Commerce's adjustments in rebuttal.  See Araupel's

Rebuttal Br. at 46–50.

In the Final Determination, Commerce continued to include the fair value

adjustments related to the unharvested forests as well as the fair value adjustments

related to consumed logs (WOODFV) in the calculations of Araupel's G&A

expenses and total cost of manufacturing, respectively.  See Final IDM at 37–38.

Commerce reasoned that this treatment "is consistent with both the statute and

prior practice."  Id. at 37.  Commerce stated that Araupel's two fair value

adjustments reflected in its financial statements are in accord with Brazilian

GAAP, which follows the International Financial Reporting Standards.  Id.  Based

on International Accounting Standards 41, which requires biological assets (such

as Araupel's standing forest trees) to be measured at each balance sheet date at

their fair value less costs to sell, Commerce concluded that the fair value

adjustments to the forests attached to the logs harvested from the forests as

additional inventoried log costs.  Id. at 37–38.  This resulted in "additional"

income and "additional" expense being recognized in Araupel's audited 2019

financial statements.  Id.  Including both sides of the fair value adjustments in the

cost of production was consistent with Araupel's normal and Brazilian GAAP-

compliant books and records, Commerce explained, while recognizing only one

side of the fair value adjustments required by Brazilian GAAP, as the Coalition

had argued, "would be unreasonable and result in a distortion of Araupel's total

reported costs."  Id.  Commerce noted that this result was consistent with "prior

practice," see, e.g., Certain Uncoated Paper from Brazil, 81 Fed. Reg. 3115 (Dep't

of Commerce Jan. 20, 2016), and rejected the Coalition's argument that the two

fair value adjustments are separate and unrelated because

> including the [period of investigation] fair value adjustments that have
> been allocated to harvested logs, i.e., those that increase costs, but
> excluding the annual fair value adjustment to the unharvested forests,
> i.e., those that decrease costs but give rise to the additional costs that
> are ultimately allocated to harvested logs, is unreasonable and
> distortive.

Final IDM at 38.  Commerce also rejected the Coalition's contention that the fair

value adjustments for unharvested forests reflect future realizable values that are

unrelated to current production costs because the value of the logs harvested from

those forests have been increased in value in fact at year's end by the revaluations

of the underlying biological assets.  See id.  Lastly, Commerce found

"unpersuasive and irrelevant" the argument that Araupel itself had classified the

fair value adjustments as an element of gross profit rather than G&A expense

items.  Id.

The Coalition argues that Commerce's change to Araupel's reported

G&A expenses to include the fair value adjustment for its unharvested forests

is contrary to law because that adjustment does not reasonably reflect costs

associated with the production and sale of subject merchandise, as required by

the statute.  Pl.'s Br. at 38.  The Coalition contends that the two biological

asset adjustments are with respect to different items and are separate: one

adjustment affects the cost of logs consumed during the period of investigation

(reported through the WOODFV field); the other is unrelated to the cost of

wood consumed during the period of investigation and merely reflects an

increase in the future realizable value that Araupel hopes to make on

unharvested wood.  Id.  The Coalition emphasizes that Araupel itself did not

classify fair value adjustments as G&A expense items and had argued against

adjusting G&A expenses to reflect the adjustments.  Id. at 39.  The Coalition

argues that the unharvested forests have no effect on the period of investigation

production costs and therefore should not have been used in the cost calculations in

this investigation.  Id.  The Coalition points out that Commerce has long held, as

required by the statute, that it must deviate from a company's books and records

when the resulting costs do not "reasonably reflect the costs associated with the

production and sale of the merchandise."  Id. (citing 19 U.S.C. §

1677b(f)(l)(A); Certain Steel Concrete Reinforcing Bars from Turkey, 73 Fed.

Reg. 66,218 (Dep't of Commerce Nov. 7, 2008) (Commerce will not use GAAP-

compliant records if they are not reasonable)).  Because the fair value

adjustment to Araupel's unharvested forests is unrelated to the cost of

production for merchandise under consideration produced during the period of

investigation, the Coalition maintains, Commerce erred in including this

adjustment to Araupel's reported costs.  Id. at 39–40.

Commerce has discretion over how the costs of production under 19 U.S.C.

§ 1677b(f)(1)(A) are to be calculated in an investigation or review.  See Dongbu

Steel Co. v. United States, 39 CIT __, __, 61 F. Supp. 3d 1377, 1385 (2015).

Moreover, the U.S. Court of Appeals for the Federal Circuit has opined that

"failure to account for inventory holding time during a period of rising costs is

unreasonable," albeit under the particular facts of Thai Pineapple Canning Industry

Corp. v. United States, 273 F.3d 1077, 1085 (Fed. Cir. 2001).

In this case, Commerce's G&A expense calculation was reasonable because the adjustment was included in Araupel's audited financial statements that were found to be compliant with Brazilian GAAP, and record evidence did not demonstrate that the financial statements were distortive or did not reasonably reflect the cost of producing and selling the merchandise. Because substantial evidence supports Commerce's determination to adjust Araupel's reported G&A expenses, and the adjustment in compliance with Brazilian GAAP was in accordance with the law, the Court sustains Commerce's determination.

### IV.    Calculation of Imputed Credit Expenses and Inventory Carrying Costs

Commerce may make a "circumstance of sale" adjustment to normal value in antidumping calculations to account for differences in credit terms between sales made in the home and U.S. markets. See 19 U.S.C. § 1677b(a)(6)(C)(iii). To calculate U.S. credit expenses and inventory carrying costs for purposes of this adjustment, Commerce normally relies on the interest rate for the respondent's short-term borrowings in U.S. dollars. See Import Administration, Policy Bulletin 98.2 (Feb. 23, 1998), available at https://access.trade.gov/Resources/policy/bull98-2.htm. When the respondent does not have any such short-term borrowings,

Commerce uses "the Federal Reserve's weighted-average data for commercial and industrial loans maturing between one month and one year from the time the loan is made." Id.  Commerce has determined that such data meets three criteria applicable to the selection of a short-term borrowing rate: the data are (1) reasonable, (2) readily obtainable and predictable, and (3) reflect "a short-term interest rate actually realized by borrowers in the course of 'usual commercial behavior' in the United States." Id.  Policy Bulletin 98.2 contains a link for such data to the Federal Reserve's Survey of Terms of Business Lending ("Survey of Terms of Business Lending"), indicating that this survey constitutes the appropriate source for such data.  See id.

Araupel reported that it had no qualifying short-term U.S. dollar borrowings during the period of investigation from which Commerce could derive appropriate U.S. credit and inventory carrying cost expenses.  See Final IDM at 49; see also Araupel's Sections B and C Questionnaire Resp. (May 6, 2020) ("Araupel BCQR") at C-53–C-55, PR 192.  Araupel reported these expenses based on a 2.16 percent interest rate derived from rates published by the Federal Reserve Bank of New York for federal funds market transactions.  Araupel BCQR at Ex. C-17.[8]

---

[8] "The federal funds market consists of domestic unsecured borrowings in U.S. dollars by depository institutions from other depository institutions and certain other

The Coalition argued that the rate utilized by Araupel was inappropriate, and that

the company should use a 5.73 percent interest rate derived from the Federal

Reserve's Small Business Lending Survey ("Small Business Lending Survey").

CAMP's Comments Araupel's Section C Questionnaire Resp. (May 20, 2020) at

21–23, PR 205–06.  The Coalition explained that in Policy Bulletin 98.2,

Commerce had indicated that appropriate short-term lending rates for calculating

imputed credit expenses were those derived from the Survey of Terms of Business

Lending and that the Federal Reserve had replaced the Survey of Terms of

Business Lending with the Small Business Lending Survey in 2018.  Id. at 22, Ex.

2.  The Coalition argued that Araupel should revise its reporting based on the

Small Business Lending Survey rate, and it provided Small Business Lending

Survey data for each quarter of the period of investigation.  Id. at 22, Ex. 1.

     Commerce evidently agreed that Araupel's original reporting was not

appropriate, issuing a supplemental questionnaire instructing Araupel to revise its

reporting.  Araupel's Suppl. Sections A and C Questionnaire Resp. (July 6, 2020)

("Araupel SACQR") at SAC-38, SAC-41, PR 280–84.  In making this request,

however, Commerce referred to the defunct Survey of Terms of Business Lending

---

entities, primarily government-sponsored enterprises."  See Effective Federal Funds
Rate, Fed. Rsrv. Bank of N.Y., available at:
https://apps.newyorkfed.org/markets/autorates/fed%20funds.

rather than the Small Business Lending Survey.  Id. at SAC-38.  Araupel did not

revise its reporting, stating that the Survey of Terms of Business Lending had been

discontinued.  Id.  Araupel also argued that the Small Business Lending Survey did

not provide an appropriate rate because it related to loans to small businesses, and

Araupel was not a small business.  Id. at SAC-38–SAC-39, SAC-41.

      In its preliminary determination, Commerce relied on the 2.16 percent

interest rate reported by Araupel to derive credit expenses and inventory carrying

costs.  See Final IDM at 50.  The Coalition argued in its case brief that this rate

was inconsistent with Policy Bulletin 98.2, which specifically referred to the Small

Business Lending Survey's predecessor survey as an appropriate source of rates.

CAMP's Case Br. at 52–53.  The Coalition also pointed out that the Small

Business Lending Survey, like the Survey of Terms of Business Lending, was

based on interest rates charged for "commercial and industrial loans made by all

commercial banks."  Id. at 53.  Further, the Coalition argued that the 5.73 percent

Small Business Lending Survey rate was consistent with the short-term borrowing

rate reported by BrasPine (with which Araupel was ultimately collapsed).  Id.; see

Final IDM at 9–17.  In its Final Determination, Commerce continued to rely on the

2.16 percent interest rate, characterizing it as a "published U.S. dollar short-term

borrowing rate."  Final IDM at 50.

      The Coalition argues here that Commerce should not have used the Federal

Reserve Bank of New York's 2.16 percent interest rate because the Small Business

Lending Survey's 5.73 percent interest rate is "consistent with" and "very similar"

to the 5.28 percent interest rate used for BrasPine. Pl.'s Br. at 44. The Federal

Reserve Bank of New York short-term interest rate is unreasonable, the Coalition

contends, because: (1) "the rate does not correspond to 'data for commercial and

industrial loans;'" (2) the Federal Reserve Bank of New York data pertains to loans

data collected from depository institutions and "the record does not indicate that

Araupel is a 'depository institution;'" and (3) Commerce collapsed Araupel with

BrasPine and "used different imputed credit interest rates for what Commerce itself

has found to be a single company." Id. at 42–44. Commerce determined that the

Small Business Lending Survey data meets the criteria of Policy Bulletin 98.2 in

Polyethylene Terephthalate Sheet from the Republic of Korea ("PET Sheet"), 85

Fed. Reg. 44,276 (Dep't of Commerce July 22, 2020) and in 4th Tier Cigarettes

from the Republic of Korea ("Korean Cigarettes"), 85 Fed. Reg. 79,994 (Dep't of

Commerce Dec. 11, 2020), and the Coalition argues that Commerce should

similarly have used the Small Business Lending Survey data to impute Araupel's

credit expenses in this instance. Pl.'s Br. at 43–44.

Defendant argues that the Small Business Lending Survey data was based on

a survey of loans to small businesses and that these small businesses were defined

as companies with $5 million or less in annual gross revenue. Def.'s Resp. at 42–

43.  Defendant asserts that because Araupel's annual revenue exceeded the $5

million threshold, Commerce concluded reasonably that applying the short-term

interest rate from the Small Business Lending Survey data would be inappropriate.

<u>Id.</u>  Further, Defendant contends that Commerce is presumed to have adequately

considered the issue and all the evidence in the record in making its decision.  <u>Id.</u>

(citing <u>Taiwan Semiconductor Indus. Ass'n v. United States</u>, 24 CIT 220, 237, 105

F. Supp. 2d 1363, 1378 (2000)).  The absence of an explicit and comprehensive

discussion does not satisfy the burden to rebut that presumption nor justify a

remand on procedural grounds because Commerce's path to its decision is

reasonably discernible.  <u>Id.</u> at 43–44.  Both options were publicly available

information based on averages of rates for actual borrowers and reflective of usual

commercial behavior, so the issue was simply which of the two options would be a

reasonable reflection of Araupel's short-term borrowing.  <u>Id.</u> at 44.  Commerce

decided that selection of the Small Business Lending Survey short-term interest

rate was unreasonable (i.e., Policy Bulletin 98.2's first criterion) because the data

pertained to loans issued to small businesses and Araupel did not fit the survey's

description of a small business, according to Defendant.  <u>Id.</u>

     Defendant also argues that <u>PET Sheet</u> and <u>Korean Cigarettes</u> do not amount

to an administrative "practice" of using the Small Business Lending Survey short-

term interest rate to impute credit expenses denominated in U.S. dollars, nor do

these administrative determinations indicate that Commerce has previously used

the Small Business Lending Survey short-term interest rate to impute credit

expenses for a respondent that is not the type of borrower that would be eligible to

receive the rates compiled in the survey.  Def.'s Resp. at 44–45.  As to the

Coalition's remaining arguments, Defendant contends that they are being raised for

the first time and are not properly before the Court and that the arguments lack

merit in any event because: (1) the Coalition has not demonstrated that the Federal

Reserve Bank of New York short-term interest rate does not reflect what borrowers

would receive in the course of "usual commercial behavior;" (2) the Federal

Reserve Bank of New York data pertain to entities that would provide commercial

loans and the Coalition offers no argument as to why the information collected

from these depository institutions is not a reasonable surrogate for Araupel's U.S.

dollar short-term borrowings; and (3) the argument that Commerce must use the

same surrogate short-term interest rate to impute credit expenses for a collapsed

entity does not favor the Coalition's position because Commerce did not use the

Small Business Lending Survey short-term interest rate for BrasPine.  Id. at 45.

   The imputation of credit expenses "is based on the principle of the time

value of money" and "must correspond to a dollar figure reasonably calculated to

account for such value during the gap period between delivery and payment."

LMI-La Metalli Industriale, S.p.A. v. United States, 912 F.2d 455, 460–61 (Fed.

Cir. 1990).  Commerce's policy guidance states that the seller "is effectively

lending [the currency of the sale] to its purchaser between the time it ships the

merchandise and the time it receives payment."  Policy Bulletin 98.2.  Commerce's

policy is to calculate imputed credit expenses based on the weighted-average

interest rate paid by the respondent for short-term loans in the currency of sale.  Id.

In cases when respondents have no U.S. short-term loans, Commerce uses the

following criteria for determining a surrogate U.S. dollar short-term interest rate:

(1) "the surrogate rate should be reasonable;" (2) "it should be readily obtainable

and predictable;" and (3) "it should be a short-term rate actually realized by

borrowers in the course of 'usual commercial behavior' in the United States."  Id.

The surrogate short-term interest rate is tied to the currency in which the sales are

denominated and is based on publicly available information.  Id.  Policy Bulletin

98.2 announced that for U.S. dollar transactions, Commerce will generally use "the

Federal Reserve's weighted-average data for commercial and industrial loans

maturing between one month and one year from the time the loan is made" because

these rates meet the three criteria.  Id.

    In its Final Determination, Commerce stated that its selection between the

two data sources of record was guided by the three criteria described above in

Policy Bulletin 98.2, and Commerce concluded that the Small Business Lending

Survey did not meet these criteria.  Final IDM at 50.  Specifically, Commerce

determined that the Small Business Lending Survey's data pertained to "loans *by* small businesses" and that Araupel was not a small business.  Id. (emphasis added).  The Coalition argues that Commerce's statement regarding the Small Business Lending Survey data is incorrect, insisting that Commerce meant what it said, but at the same time, the Coalition admits that the Small Business Lending Survey data obviously pertained to loans *to* small businesses, not loans *by* small businesses.  See Pl.'s Br. at 42; Pl.'s Reply at 20.  The Court reads Commerce's statement "loans by small businesses" as a harmless, typographical error because clearly the context here is that the Small Business Lending Survey data involves loans *to* small businesses rather than loans *from* small businesses.  Commerce's statement can also readily be interpreted to mean "loan proceeds taken by small businesses," which would be consistent with the obvious intent of the Final Determination.  The issue is whether Araupel is a small business or not, and whether the Small Business Lending Survey interest rate would thus apply to Araupel as a small business.  Because Araupel's annual revenue exceeded $5 million, Araupel is ineligible to be considered a small business under the relevant definition, and the Court concludes that Commerce's decisions not to use the Small Business Lending Survey interest rate and to use the 2.16 percent interest rate from the Federal Reserve Bank of New York were reasonable and in accordance with the law.  The Court does not view the typographical error by Commerce to require

a remand for clarification, given the context.  The Court concludes that

Commerce's selection of the Federal Reserve Bank of New York's interest rate

was in accordance with the law.

## CONCLUSION

In view of the foregoing, the Court sustains Commerce's <u>Final</u>

<u>Determination</u> and denies Plaintiff's motion for judgment on the agency record.

Judgment will be entered accordingly.

_/s/ Jennifer Choe-Groves_

Jennifer Choe-Groves, Judge

Dated:    June 15, 2022
      New York, New York